UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*ECF CASE*

MARKETXT HOLDINGS CORP. AND MARKETXT, INC.

*JUDGE BATTS*

Plaintiffs,

Case No.

04 CV 2707

-against-

MASAYOSHI SON, ROBERT TAKEUCHI, SHINJI
YAMAUCHI, RONALD FISHER, SOFTBANK FINANCE
CORP., SOFTBANK CORP., E*TRADE FINANCIAL
CORP., TTH ACQUISITION CORP., MHI ACQUISITION
CORP., JARRETT LILIEN, MITCHELL CAPLAN,
STEPHEN EHRLICH, ,

Defendants.



RECEIVED
APR 08 2004
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiffs MarketXT Holdings Corp. (formerly known as, and hereafter referred to as "T Corp") and MarketXT, Inc. ("MarketXT") allege as and for their Complaint, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This action seeks in excess of $1.5 billion in compensatory damages (as well as punitive damages) caused by defendants' misconduct in connection with a transaction, in April 2002, pursuant to which T Corp sold to E*Trade Financial Corp. (formerly known as E*Trade Group, Inc., and hereafter referred to as "E*Trade") and its merger subsidiaries, TTH Acquisition Corp. and MHI Acquisition Corp. (the "Merger Subs"), three of T Corp's subsidiaries, Tradescape Momentum Holdings, Inc. ("MHI"), Tradescape Technology Holdings, Inc. ("THI") and Momentum Securities, LLC ("Momentum") (collectively, the "Acquired Companies" or "Tradescape").

2.      In summary, Defendants made material misrepresentations to induce Plaintiffs to sell Tradescape (which, according to a national magazine, was considered one of the "Top 50 Private Companies in the World" in 2001) to E*Trade and not to E*Trade's competitors or the other parties that were interested in an acquisition.  Defendants then sought to avoid paying for these newly-acquired companies by disregarding their contractual commitments to Plaintiffs; threatening economic and  even physical harm, and criminal prosecution to extort onerous and unconscionable concessions from Plaintiffs notwithstanding Plaintiffs' contractual rights; defaming T Corp's  29 year old founder and CEO, Omar Amanat, and through this and other illegal methods interfering with Plaintiffs' ability to enter into crucial loans and other types of transactions; converting Plaintiffs' property, including by preventing Plaintiffs from accessing technology crucial to operating the MarketXT business; improperly terminating Mr. Amanat's employment with E*Trade; and the catalogue of wrongdoing goes on and is discussed in greater detail below.

3.      The focus of all this misconduct involves T Corp's Momentum and MarketXT subsidiaries.  At the time of the merger Momentum was, according to a Robertson Stephens research report, the fifth largest electronic brokerage firm in the United States and the largest active trading firm in the industry with over 20 branch offices nationwide.  Momentum also provided high-speed direct-access trading technologies to retail customers and was responsible for roughly 8% of the Nasdaq's daily volume.  It generated 2001 revenues of approximately $121 million and 2000 revenues of approximately $140 million.

4.      MarketXT is the only T Corp subsidiary that was not conveyed to E*Trade.  MarketXT is an Electronic Communications Network ("ECN"), or quasi-stock exchange, one of nine such entities approved by the Securities and Exchange Commission ("SEC") to automatically match buy and sell orders for the electronic execution of stock trades.

MarketXT's customers consisted primarily of institutional investors and broker-dealers, including Merrill Lynch, CS First Boston, Salomon Smith Barney, and Morgan Stanley.  At the time of the merger, MarketXT was the second or third largest ECN, and was responsible for 10% of all share volume executed on Nasdaq.   MarketXT provided its customers, including Momentum, with rebates for placing buy or sell orders on MarketXT.  Because Momentum customers executed many trades on MarketXT, the rebates paid by MarketXT provided a significant portion of Momentum's revenues.  Moreover, because of this symbiotic relationship whereby traders using Momentum executed a significant volume of transactions on MarketXT (and Momentum received rebates in return), and E*Trade had promised to expand the Momentum business following the merger, Plaintiffs falsely were led to believe that MarketXT would increase its revenues as a result of the merger.   In fact, E*Trade had suggested that it would co-clear MarketXT's trades to help reduce its overhead and expenses.

5.     Just the opposite occurred, as would prove to be the case with all of Defendants' representations:  E*Trade and Softbank Finance Corporation ("Softbank"), a wholly owned subsidiary of Softbank Corporation ("Softbank Corp."), as well as senior management of both companies (including the individuals named as defendants herein), conspired to fraudulently induce T Corp to sell Tradescape to E*Trade, and then (through breach of contract, threats of physical and economic harm, criminal prosecution, improper employment termination, theft of property and defamation) deprive T Corp of the consideration due and owing under the Merger Agreement.  Defendants also engaged in this same type of egregious misconduct to put MarketXT – a fierce and faster growing competitor to E*Trade's partially owned ECN subsidiary (Archipelago), and a key source of revenue for Momentum – out of business.

6.     Softbank's motivation to participate in this wrongdoing is self-evident and boils down to greed:  it sought to protect its $400 million investment in E*Trade.  Softbank was

a significant investor in both T Corp and E*Trade, having paid approximately $400 million for 27% of E*Trade's outstanding common stock and only $26 million for 25% of T Corp. Softbank also owned approximately 67% of E*Trade Japan, and had appointed representatives to the Boards of Directors of both E*Trade and T Corp.  Softbank's outside counsel also attended all meetings of T Corp's Board of Directors during the relevant period.  In addition, Softbank owned almost all of T Corp's outstanding preferred stock, and was a lender to T Corp secured by a lien on T Corp's intellectual property.

7.     By virtue of its substantial stock ownership, board membership and control over T Corp's intellectual property, Softbank effectively had the ability to veto any sale or other transaction involving Tradescape.  Notwithstanding the obvious conflict of interest confronting Softbank given its relationship with E*Trade and T Corp and its independent duties to each, Softbank did not abstain from decisions affecting the E*Trade-T Corp relationship.  To the contrary, it used its position of trust vis a vis T Corp to further the interests of E*Trade (and thus advance Softbank's own substantial investment in that company) to the severe detriment of T Corp.

8.     In that regard, on April 10, 2002, E*Trade and T Corp executed a Merger Agreement.  As described in more detail below, the Agreement provided for E*Trade to acquire Tradescape for approximately $280 million in E*Trade stock; $100 million of this amount was payable immediately (subject to certain transfer restrictions), with the remainder payable as "contingent compensation" as long as Momentum satisfied certain easily achievable revenue targets for 2002 and 2003 (the "Earn-Out").

9.     Plaintiffs reasonably believed that those targets were readily attainable by Momentum because, in the period leading up to the execution of the Merger Agreement, Tradescape was a highly successful and sought-after business in the rapidly consolidating on-line

trading industry.   Tradescape's businesses were so attractive because unlike most online brokerage businesses, including the E*Trade online business – where volume (and thus revenues) declined 40-50% from the previous year in the midst of a severe economic downturn – Momentum's volumes remained steady and robust because of its highly touted technology and profitable customer niche (an E*Trade management presentation to the E*Trade Board concluded that E*Trade "could pay up to $400 million for the Tradescape acquisition and still have it be accretive to earnings").   Indeed, Barron's recent rankings of the top online brokers listed Power E*Trade Pro (which is based on the Lightspeed technology that E*Trade acquired from T Corp in the merger) as propelling E*Trade to the highest ranking it has ever received in the survey – second place among all online brokers.

10.     In late 2001, in the aftermath of the events of September 11th, T Corp commenced an auction for the sale of Tradescape.   Numerous strategic and financial buyers immediately expressed interest in and conducted due diligence concerning an acquisition.   Many of these companies, in their proposals, valued Tradescape at between $200-$300 million, as did E*Trade.

11.     E*Trade representatives, however, made numerous false statements to T Corp to ensure that T Corp sold Tradescape to E*Trade and not to the many other qualified, well-financed bidders interested in an acquisition.   These material misrepresentations fall in the following general categories:

- E*Trade stock was the "best and most attractive currency" among the potential acquirers;

- E*Trade stock would trade at $12/share by September 2002 and $20/share by December 2002 (E*Trade stock actually closed at $4.86/share on December 31, 2002);

- E*Trade would report $1/share in earnings by the end of 2002 (its actual year-end 2002 results were a loss of approximately $186 million);

- E*Trade's financial statements fairly and accurately reflected E*Trade's financial condition (a blatant misrepresentation in light of, among other things, the misconduct described herein);

- E*Trade intended to execute a strategy to consummate further acquisitions of, or "roll-up", the active trading industry – a strategy that would have been enormously profitable for Momentum – but unlike T Corp, E*Trade knew it would never follow through on this strategy; and

- T Corp's CEO, Omar Amanat, would have full operational control over the Momentum business, as well as additional necessary resources and capital, and would eventually run E*Trade's entire retail brokerage business (Mr. Amanat was terminated a few weeks after the merger closed).

These representations succeeded in inducing T Corp to sell to E*Trade. Unfortunately for T Corp, however, each of these representations and others along the same lines were false.

12.    In addition, at no time during the negotiations leading to the agreement did E*Trade representatives disclose any facts regarding E*Trade's exorbitant executive compensation arrangements, namely, that E*Trade privately had committed to pay its CEO, Christos Cotsakos, compensation of nearly $90 million in 2001.

13.    The public disclosure, made for the first time at the end of April 2002, that E*Trade had privately paid Cotsakos $88 million – made just weeks **after** E*Trade and T Corp executed a merger agreement – caused the price of E*Trade shares to decline dramatically and resulted in the value of the consideration paid for the acquisition to drop from approximately $300 million to below $200 million within days of the announcement. The price of E*Trade stock continued to decline thereafter due to a widely reported "corporate governance penalty" overhang on the stock, dramatically reducing the value of the consideration paid to T Corp, as more allegations regarding the excessive compensation and lavish perks paid to E*Trade executives were extensively reported in the media.

14.     Additional misconduct by Defendants resulted in Plaintiffs being deceived as to the value of the E*Trade stock they received in the transaction.  After the closing of the merger, T Corp discovered that E*Trade had a practice of manipulating its reported financial results through a number of improper methods, including capitalizing as assets certain payments that clearly should have been expensed immediately, thereby artificially inflating E*Trade's profit figures.   T Corp was also informed that E*Trade engaged in the practice of "springloading" (i.e., reporting unduly positive) results in connection with acquisitions by improperly attributing and shifting costs incurred following an acquisition (and that should have been payable and expensed by E*Trade) to the pre-closing period (when they would have to be paid by the seller).

15.     Moreover, Softbank breached its fiduciary duties to T Corp at this time. As noted, Softbank had a lien on T Corp's intellectual property.  By refusing to release its lien on T Corp's intellectual property other than in connection with a sale to E*Trade, Softbank thereby compelled T Corp to consummate a transaction with E*Trade, and prevented T Corp from pursuing potentially more attractive sale opportunities or receiving financing from willing financial investors.

16.     In short, Softbank and E*Trade's campaign to mislead T Corp as to the value of the E*Trade stock it would receive in exchange for T Corp, including the failure to disclose Cotsakos' compensation package, and Softbank's breach of its fiduciary duties, caused Plaintiffs to agree to the transaction and resulted in hundreds of millions of dollars of damages.

17.     Once E*Trade had succeeded in acquiring Tradescape, Defendants then did everything in their power to deny T Corp the Earn-Out, including putting MarketXT out of business (and thus denying Momentum the rebate revenues generated by MarketXT).  The catalogue of offenses committed by defendants to put MarketXT out of business and ensure that

Momentum did not meet the revenue targets for the Earn-Out also included E*Trade: (i) wrongfully terminating the employment of Mr. Amanat with E*Trade without cause, thereby violating the provision of the Merger Agreement which granted him post-closing authority over the Momentum business, and further impeding Momentum's ability to satisfy the Earn-Out requirements; (ii) approaching the NASD with a re-stated and false net-capital report for Momentum showing millions of dollars in receivables still owed from MarketXT for the sole and improper purpose (which was realized) that the NASD would shut down MarketXT due to this perceived net capital deficiency; (iii) refusing to use "commercially reasonable efforts" to register T Corp's E*Trade stock "as soon as practicable" after the merger closed, as was required by the Merger Agreement, further thwarting T Corp's ability to obtain funds and to correct MarketXT's net capital issues; (iv) rejecting two bona fide, signed $20 million commission contracts obtained by T Corp from two large hedge fund clients - business that certainly would have been welcomed by E*Trade for the newly acquired Momentum subsidiary except for the fact that it would have been credited toward the contingent portion of the merger consideration; (v) illegally freezing out and denying MarketXT access to its network, which essentially shut MarketXT down, and prevented T Corp from obtaining a loan (which was contingent on showing the lender that MarketXT had access to a data center, since an ECN cannot operate without a data center) that would have provided the necessary funds to operate MarketXT; and (vi) converting all of T Corp's electronic files, including e-mails, financial data, attorney-client privileged documents, and proprietary intellectual property records, which barred MarketXT from accessing its own files and led MarketXT to be unable to respond to certain regulatory and legal obligations, and further contributed to MarketXT being shut down.

18.     Not to be outdone, Softbank resorted to threats of physical and economic harm against T Corp and Mr. Amanat.   In early September 2002, Softven No. 2 Investment

Enterprise Partnership ("Softven"), a Japanese partnership affiliated with Softbank, filed a motion for summary judgment in lieu of complaint against T Corp in New York state court seeking to recover on a promissory note issued by T Corp. Thereafter, Robert Takeuchi, one of the representatives Softbank had appointed on the T Corp Board of Directors, called Mr. Amanat's home on or about January 26, 2003 and threatened the lives of Mr. Amanat and his family. During that call, Mr. Takeuchi stated that Softbank had "friends" in Japan who were experts in burying people like Mr. Amanat, as well as his family, "ten feet underground" where no one would ever find them. To avoid this fate Mr. Amanat had to comply with Softbank's demands by, among other things, settling the litigation on Softbank's unconscionable terms. Not content with threats of physical violence, Softbank also repeatedly threatened to drive T Corp into bankruptcy unless it settled the Softven litigation. These threats of physical and economic harm coerced Mr. Amanat and T Corp into executing a settlement agreement, under duress, resolving the Softven lawsuit on draconian and unconscionable terms. The release given as part of that settlement is unenforceable for a variety of reasons including, but not limited to, the threats of physical and economic harm which constitute coercion and duress.

19.     The misconduct described above (which is by no means an exhaustive description of Defendants' wrongdoing) has caused significant injuries to Plaintiffs.

- The Earn-Out alone is worth $300 million (21 million E*Trade shares at the current price per share);

- T Corp has sustained damages in excess of $200 million by virtue of having been fraudulently induced to agree to an $8.51 collar on the merger consideration. The fraudulently induced collar resulted in damages to T Corp when the stock price declined pre-closing to $6.04/share. Without the collar T Corp would have received an additional fifteen million shares of E*Trade stock, which would now be worth $200 million;

- By purposefully driving MarketXT out of business, defendants have inflicted as much as $1 billion in additional damages on plaintiffs (based

on sales of comparable electronic communications networks within months of MarketXT's demise and the recent public offering by the E*Trade affiliate, Archipelago ECN);

- Defendant's tortuous interference with loan agreements with numerous third parties resulted in T Corp paying an additional $20 million in interest for financing, and forced T Corp to allow its primary lender to hedge most of T Corp's E*Trade shares at $4.50/share, creating another $90 million in damages;

- The conversion of T Corp's hardware, software and equipment has caused it to suffer damages in excess of $10 million.

20.     Plaintiffs have brought this action to remedy the deliberate and continuing campaign of misconduct carried out jointly by Defendants for one goal and one goal only: to succeed in buying a business worth hundreds of millions of dollars while paying only a fraction of the contractual merger consideration, and driving a competitor out of business.   That wrongdoing is the basis for the allegations, claims and damages sought herein.

## <u>PARTIES</u>

21.     Plaintiff MarketXT Holdings Corp. is a Delaware corporation with its principal place of business at 712 Fifth Avenue, New York, New York.

22.     Plaintiff MarketXT, Inc., is a Delaware corporation with its principal place of business at 712 Fifth Avenue, New York, New York.

23.     Upon information and belief, defendant E*Trade is a publicly-traded company incorporated and existing under the laws of the State of Delaware, with its principal place of business at 135 East 57th Street, New York, New York.  Upon information and belief, defendants TTH Acquisition Corp. and MHI Acquisition Corp. are wholly owned E*Trade subsidiaries incorporated under the laws of the State of Delaware.

24.     Upon information and belief, defendant Jarrett Lilien was, at all relevant times, the Chief Brokerage Officer of E*Trade.

25.     Upon information and belief, defendant Mitchell Caplan was, prior to the January 2003 resignation of Christos Cotsakos, the Chief Operating Officer of E*Trade.  Mr. Caplan became the Chief Executive Officer of E*Trade upon Mr. Cotsakos' resignation.

26.     Upon information and belief, defendant Stephen Ehrlich was, prior to the closing of the merger, the Chief Financial Officer of E*Trade's Institutional Services division. Following the merger Mr. Ehrlich became the Chief Executive Officer of Momentum (which E*Trade renamed E*Trade Professional Trading, LLC).

27.     Upon information and belief, defendant Softbank Finance is a corporation established under the laws of Japan that conducts regular and ongoing business activity in New York and throughout the United States.

28.     Upon information and belief, defendant Softbank Corp. is a holding company established under the laws of Japan that conducts regular and ongoing business activity in New York and throughout the United States.

29.     Upon information and belief, defendant Masayoshi Son was, at all relevant times, the President and CEO of Softbank Corp.

30.     Upon information and belief, defendant Ronald Fisher was, at all relevant times, the Vice-Chairman of Softbank Holdings, Inc., and a member of the E*Trade Board of Directors designated to that board by Softbank.

31.     Upon information and belief, defendant Robert Takeuchi was, at all relevant times, the President of Softbank Finance America Corporation, and a member of the Board of Directors of T Corp designated to that board by Softbank.

32.     Upon information and belief, defendant Shinji Yamauchi was, at all relevant times, the General Manager of the Corporate Strategy Department at Softbank Finance, and a member of the Board of Directors of T Corp designated to that board by Softbank.

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this action and over defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 28 U.S.C. §§ 1331 and 1367.   The claims asserted against Defendants herein arise from the same transactions, occurrences, and nucleus of operative facts – including the sale of Tradescape to E*Trade and the Defendants' joint attempts thereafter to deny T Corp the merger consideration.

34.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because, among other things, a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## I.     BACKGROUND

### A.     E*Trade and Softbank Fraudulently Induce T Corp To Enter Into A Merger Agreement With E*Trade

#### 1.     T Corp Commences An Auction For The Sale Of Tradescape

35.     The process of selling Tradescape commenced in or around September 2001, when Omar Amanat, the founder and CEO of T Corp, entered into negotiations with Ameritrade, Inc. ("Ameritrade") about the potential sale of all of the T Corp subsidiaries.

36.     Thereafter, in November 2001 T Corp hired a boutique advisory firm run by Steve McLaughlin, formerly of Goldman Sachs & Co., to auction the T Corp subsidiaries.  T Corp, with the assistance of Mr. McLaughlin, prepared a "book" containing information regarding T Corp and sent the book to at least fourteen potential acquirers.  Eleven of those potential acquirers, including some of the most significant participants in online brokerage services such as Ameritrade, Knight Securities, Charles Schwab, and Fidelity Investments, and prominent potential financial buyers such as CIBC, Man Financial, Kelso & Co., and Welsh Carson Anderson & Stowe, submitted proposals and sought to and in fact conducted in-depth

due diligence with the intent to purchase 100% of T Corp. These proposals valued Momentum and the other subsidiaries being auctioned at between $100 and $300 million. These proposals came in two forms. Some of the potential acquirers offered to buy Tradescape outright, with no earn-out provision. These offers would have provided T Corp with immediate liquidity, but severely limited T Corp's ability to share in any future growth of the Tradescape business. Several of the other potential investors submitted proposals that provided a significant investment into Momentum, thus leaving T Corp with a large percentage of the business and the opportunity to share in the future growth of the Tradescape business, but not providing T Corp with the immediate liquidity it desired in order to invest in its rapidly growing MarketXT subsidiary.

**2.        T Corp Does Not Invite E*Trade To Participate In The Auction**

37.        At first, T Corp instructed McLaughlin not to send the Tradescape book to E*Trade because of T Corp's experience in a prior negotiation with E*Trade. Two years earlier, during the summer of 1999, E*Trade had offered to buy T Corp for approximately $300 million. The parties reached an oral agreement based on representations by Christos Cotsakos, the CEO of E*Trade, and negotiated and finalized a written agreement, but then E*Trade requested that T Corp delay executing the formal written agreement until E*Trade consummated its pending acquisition of Telebanc (which was being held up by regulators from the Office of Thrift Supervision ("OTS")).

38.        Throughout the next six months Cotsakos and Softbank representatives gave Mr. Amanat total and unambiguous personal assurances that an E*Trade-Tradescape acquisition would be completed along the lines of the oral agreement reached between the parties. For instance, in a trip to Japan at Softbank CEO Masayoshi Son's home, Mr. Cotsakos pledged to Mr. Amanat that the deal was in effect already signed: "you have my word." Mr.

Amanat responded that Ameritrade was pushing aggressively to acquire Tradescape and that he needed certainty of E*Trade's commitment.   Mr. Cotsakos then re-affirmed his binding commitment and said that there was no reason to continue to speak to Ameritrade since this was already a done deal.   Son also assured Mr. Amanat that if Mr. Cotsakos did not honor his commitment to buy Tradescape for any reason, Softbank would "honor" it by giving Tradescape a put option to sell the company to Softbank for $326 million.   In light of the representations made by Cotsakos, and the assurances provided by Softbank's CEO, T Corp did not pursue a $275 million acquisition proposal by Ameritrade or other acquisition offers existing at that time. However, once E*Trade reneged on its pledge to buy T Corp Softbank made it known to Mr. Amanat that the put option was not available.

39.   Schwab, one of the other potential T Corp acquirers, was so convinced of the impending E*Trade acquisition that it defensively moved to acquire Cybertrader – the first company that Mr. Amanat had helped to create but no longer managed – for $488 million on January 7, 2000.   Schwab senior executive Vernon (Butch) Jones confirmed the reason for this acquisition, telling Mr. Amanat that Schwab would have instead attempted to buy T Corp had it not been under Softbank and E*Trade's "spell."   Indeed, Schwab was willing to pay $488 million for the Cybertrader business which at that time was generating only $25 million in annual revenue (compared to Tradescape's $75 million in revenue).

40.   In all, E*Trade purported to negotiate an acquisition for nearly six months – all the while with Cotsakos and other E*Trade (and Softbank) representatives (including the defendants herein) giving assurances that E*Trade would consummate a transaction – only to refuse to move forward with a purchase after all that time had elapsed and the other proposals were no longer open to T Corp.   During the six month period in which the negotiations took place T Corp had complied with E*Trade's requests: (i) not to issue options to any employees;

(ii) to put a freeze on the hiring of new employees; and (iii) not to enter into any strategic partnerships that would have grown the T Corp business, including terminating a signed $40 million investment agreement between T Corp and a $1 billion private equity firm.  All of these actions were undertaken by T Corp in expectation of closing a sale to E*Trade, and each had an adverse effect on T Corp's business.

        41.     T Corp later discovered that the reason E*Trade would not move forward with the acquisition was because federal banking regulators (at the OTS) were concerned about the undue influence of a foreign entity (Softbank) over a domestic bank.  According to news articles, the regulators were threatening not to approve E*Trade's acquisition of Telebanc if Softbank's ownership of E*Trade increased – as it would have had the Tradescape acquisition been completed by E*Trade (since Softbank owned a large percentage of Tradescape and E*Trade's Tradescape acquisition offer was composed entirely of E*Trade stock).  For months before E*Trade cut off acquisition discussions with T Corp (while attempting to close the Telebanc transaction), Cotsakos and other E*Trade and Softbank representatives knew that the OTS would prevent an E*Trade- T Corp deal, yet he continued to outright lie to T Corp that the issues holding up the Telebanc merger were insignificant (he never alluded to the real issue involving Softbank's ownership status) and that the E*Trade- T Corp transaction would be completed.  When Mr. Amanat learned of this he contacted Ron Fisher, an E*Trade director designated by Softbank, and sent him an email indicating he would be suing E*Trade and Mr. Cotsakos.  Mr. Fisher warned Mr. Amanat against doing so, stating that Cotsakos would simply badmouth T Corp and falsely blame due diligence issues as the reason E*Trade reneged on the deal.  Fisher stressed that a two-year old company like Tradescape could not survive that type of slander from the CEO of a public internet company.

### 3. E*Trade Deceives T Corp Into Allowing It To Participate In The Auction

42.     While E*Trade's deceptive conduct in 1999 caused T Corp not to include E*Trade as a potential buyer in 2001, E*Trade learned of the 2001 auction and sought to participate.  E*Trade initially expressed its interest by contacting Mr. McLaughlin in December 2001.  In that conversation E*Trade indicated that it had a "significant head start" on the other bidders in the due diligence process (because it had conducted due diligence during 1999 and because of Softbank's relationship with both companies).

43.     Recognizing that its past misconduct had led to being excluded from the auction process, E*Trade sought a meeting with Mr. Amanat to assuage his concerns about yet again dealing with E*Trade and Cotsakos.  Mr. Amanat ultimately agreed to a meeting with E*Trade because, notwithstanding past dealings, E*Trade had the resources to complete a deal and it was a logical, strategic buyer of the Momentum business (as E*Trade already had experience in the industry and was looking to expand at a time when there were few viable acquisition candidates and the industry was consolidating).

44.     Accordingly, in December 2001 Mr. Amanat, Sohail Khalid and Scott Appleby (an advisor) of T Corp met with Jerry Gramaglia, then the President of E*Trade.  The meeting focused on Mr. Amanat's concerns about his past dealings with E*Trade, and Mr. Gramaglia repeatedly sought to allay these concerns through (as Mr. Amanat later learned) a series of false statements.  For instance, Mr. Gramaglia represented that: (i)  E*Trade was an entirely new company this time around and Cotsakos was no longer calling all the shots singlehandedly; (ii) T Corp would be conducting negotiations exclusively with an entirely new group of E*Trade management, including Jarrett Lilien, E*Trade's Chief Brokerage Officer, who was not involved in the 2000 negotiations, and Mitch Caplan, the former CEO of Telebanc;

and (iii) if a deal was consummated, Mr. Amanat could continue to operate the Momentum business without interference from Cotsakos and his cronies.  Each of these statements was materially false and was intended to induce  and in fact caused T Corp to permit E*Trade to participate in the auction process, conduct due diligence and ultimately purchase the Acquired Companies.

45.     The morning following the meeting, Lilien, Stephen Ehrlich and several other E*Trade representatives came to T Corp's New York offices for additional discussions.  At this meeting the E*Trade representatives viewed T Corp's software, technology and facilities – in effect conducting preliminary due diligence.  They also were provided with copies of T Corp's financial statements, and shortly afterwards, on December 26, 2001, E*Trade submitted a written proposal to acquire Tradescape for between $250 and $350 million.  E*Trade also reiterated that since it already had a "significant head start" on the due diligence process, it wanted to close the deal quickly.  At this point E*Trade was also eager to convince T Corp that E*Trade "had the most attractive currency" among the potential acquirers in that its stock was undervalued and likely to increase in the coming year (it was trading at $10.25 per share at the time).

46.     Between January and March 2002 all of the other potential acquirers that submitted proposals had the opportunity to conduct due diligence.  During this period E*Trade and the other potential acquirers were granted full and complete access to T Corp's books and records and personnel.  E*Trade and the other potential buyers had access to and reviewed approximately 100 binders of legal, accounting, and compliance files regarding Tradescape. E*Trade itself brought in a team of 50 people, including internal and external lawyers, investment bankers, accountants and business executives to assist in the due diligence process and interface with T Corp's outside counsel, investment bankers, and auditors from Ernst & Young.

47.     After completing to its satisfaction the extensive due diligence process, E*Trade submitted a formal offer to T Corp in a letter dated March 15, 2002.  In that letter, E*Trade offered to purchase the Acquired Companies for E*Trade stock valued at that time at approximately $280 million; approximately $100 million was payable at closing, with contingent consideration of additional E*Trade stock then worth $180 million (and recently worth approximately $300 million) payable upon Momentum achieving certain revenue targets in 2002 and 2003.  This proposal was particularly favorable for T Corp because unlike the other proposals it had received, which offered either immediate liquidity or the benefits of future growth, the E*Trade proposal offered both.

**4.      E*Trade Deceives T Corp Into Selling Tradescape To E*Trade**

48.     In the course of the auction for Tradescape, E*Trade made numerous false statements to T Corp to induce it to sell to E*Trade.  Although E*Trade stock was only trading at approximately $9.50 per share in March 2002, Jarrett Lilien and other E*Trade executives represented that E*Trade shares would trade at $12 per share by September and $20 per share by December of 2002 (it actually closed at $4.86 in December 2002).  Thus, while time and again representing that E*Trade's shares were undervalued and that the price of the stock would rise significantly within the year, E*Trade knowingly concealed from Plaintiffs material facts that made these statements patently false.

49.     Most importantly, at no time during the negotiations leading to an agreement did E*Trade representatives disclose any facts regarding its CEO's compensation arrangements, namely, that E*Trade had privately paid Cotsakos nearly $90 million in 2001.  This grossly excessive compensation was clearly material to investors but was not disclosed to T Corp.  The disclosure, which occurred at the end of April 2002 – just weeks after E*Trade and T Corp had executed a merger agreement – caused the price of E*Trade shares to decline

dramatically and resulted in a $100 million loss in the value of the acquisition within days of the announcement.

50.     The material omissions concerning E*Trade did not stop there.  Rather, as Mr. Amanat would later learn, E*Trade had improperly capitalized approximately $10 million of expenses as assets, thereby artificially inflating its profit figures.  To cite just one instance, E*Trade would capitalize the cost of promotions, including Rolling Stones and Third Eye Blind concerts and certain extravagant parties (including one planned at the Playboy Mansion), instead of reporting such costs as expenses.  When Mr. Amanat asked about the accounting treatment for these parties, he was informed by E*Trade Professional Trading, LLC's newly appointed chief financial officer, Michael Chochon, that E*Trade kept two sets of books – one for Wall Street and one for E*Trade's eyes only.

51.     E*Trade also engaged in conduct reminiscent of alleged conduct at Tyco. E*Trade has admitted excessive undisclosed compensation for Mr. Cotsakos.  Furthermore, there are no shortage of witnesses to the excess that characterized E*Trade's affairs.  One of these decadent parties, in Houston, Texas, was attended by a reporter for the New York Times.  A $1.5 million party (improperly capitalized as a "branding" asset) that was held in New York City at the Hammerstein Ballroom, which was attended by much of E*Trade's senior management, was replete with ice carvings, Cirque Du Soleil acrobats, and a private performance by the rock band Third Eye Blind (which by itself cost $500,000).  The New York City party was also attended by a reporter for the Washington Post and Fortune Magazine, and was videotaped by an attendee.

52.     Also reminiscent of allegations concerning Tyco, E*Trade manipulated accounting rules relating to its acquisitions.  Stephen Ehrlich told Mr. Amanat in a post-closing strategy meeting that E*Trade was going to use a "tried and true" method to make Momentum's post-closing numbers look better by "stuffing" or attributing expenses that could be accrued in

June or July (i.e. post closing) to the pre-closing period (i.e. to T Corp).  Jarrett Lilien summed up E*Trade's willingness to report inaccurate financial results as follows:

> Omar, you will learn as I have, that running a public company is a lot different than running a private one.  In a private company, you manage the cash.  In a public company you manage the street and there are a lot of tricks you can use to make your numbers look better when you are a public company than when you are a private company.

### 5.     Softbank and E*Trade Coerce T Corp To Consummate The Transaction with E*Trade

53.     Softbank actively participated in E*Trade's misconduct, in breach of its fiduciary duty to T Corp, by compelling T Corp to sell Tradescape to E*Trade, and cutting off T Corp's ability to pursue potentially more attractive acquisition candidates or receive a significant investment of capital.  Specifically, in early March, 2002, Schwab, which had learned of T Corp's potential transaction with E*Trade, submitted an all-stock offer to acquire Tradescape, subject to completing due diligence, for $200 million up-front, with no portion deferred as contingent compensation.  Because it was late entering the auction process, however, Schwab requested that T Corp delay a sale to allow it to conduct due diligence.  When T Corp approached E*Trade and Softbank regarding extending the period of the auction, E*Trade refused, and began to exert pressure on T Corp to execute the deal immediately.  E*Trade's investment bankers even indicated that Cotsakos had told them that they would be fired if a transaction was not completed immediately.

54.     Between March 22 and April 9, 2002, E*Trade and T Corp representatives negotiated the terms of a written merger agreement pursuant to which E*Trade would acquire all of the T Corp subsidiaries other than MarketXT, including Momentum, MHI, and THI.  During this interval, E*Trade was also pursuing an acquisition of Datek Online ("Datek"), another active trading online brokerage firm that was conducting an auction for its sale.  According to an

E*Trade board presentation "Plan A" was to buy Datek, while "Plan B" was to buy Tradescape and "roll-up" (consolidate) the rest of the active trading industry.  However, on or about April 2, when it became clear to E*Trade that Datek was going to be acquired by archrival Ameritrade, E*Trade became even more anxious not to be seen as falling too far behind Ameritrade in the extremely competitive online brokerage business.   Thus, on or about April 5, E*Trade aggressively pushed T Corp to agree to a deal and finalize a merger agreement "at once", and E*Trade's then CEO Cotsakos communicated to T Corp that the E*Trade offer would only remain open for one week.

55.     E*Trade explained that it wanted to conclude a deal quickly so as to coincide its announcement with a Datek transaction because E*Trade believed Ameritrade would be seen as overpaying for its $1.3 billion acquisition, while E*Trade would be seen as "smart, disciplined and not overpaying" for T Corp at a purchase price of $280 million while receiving more trading volume from Tradescape than Datek would give Ameritrade.  The acquisition would also catapult E*Trade to the new #1 spot among all online brokerage firms in terms of daily transactions (the leading measurement for the industry) only days after archrival Ameritrade had claimed that title.

56.     While E*Trade was intent on securing the benefits accruing from an acquisition of Tradescape, it also, unbeknownst to T Corp, repeatedly made materially false and misleading statements and material omissions – as to Cotsakos' compensation, for instance – to induce T Corp to sell the Acquired Companies to E*Trade and not the many other entities bidding for these businesses.

## B.    THE TERMS OF THE MERGER AGREEMENT

57.    T Corp executed the Merger Agreement with E*Trade on April 10, just two days after rival Ameritrade announced its $1.3 billion acquisition of Datek.  E*Trade touted the acquisition of T Corp in a press release by Cotsakos and Lilien, who stated:

> We have the currency and resources for selective, disciplined acquisitions, allowing us to look at all opportunities, but select only the best.  Through the strategic acquisition[] of Tradescape..., at the right price and on the right terms, E*Trade Financial is solidly positioning itself as a leading provider of active trading services....  Tradescape delivers incremental revenue at attractive margins and positions E*Trade as a leader in daily average transactions.   The  performance-driven  contingent  stock consideration helps to ensure the value proposition of the deal in accordance with our disciplined acquisition strategy.   Over a period of months, we have explored numerous alternatives and firmly concluded that the acquisition of Tradescape is the ideal choice.

58.    As initial consideration for relinquishing its ownership interest in the Acquired Companies E*Trade was supposed to provide T Corp with $100 million in E*Trade stock (the "Initial Consideration").  However, under Section 1.4(c) of the Agreement, the actual number of E*Trade shares transferred to T Corp as  Initial Consideration was calculated by dividing $100,000,000 by the average closing price of E*Trade common stock during the ten day period leading up to the "effective date" of the merger (June 3, the date the transaction closed).

59.    Relying on false statements made by E*Trade regarding its financial performance, T Corp agreed to a collar of $8.5106/share on the Initial Consideration shares.  As a result, if the average closing price of E*Trade shares in the relevant period fell below $8.5106, T Corp would not receive any additional shares to reach the $100 million figure.  Thus, a precipitous decline in the price of E*Trade shares prior to closing would mean an equally precipitous decline in the value of the Initial Consideration.  In contrast, as long as the price of E*Trade shares stayed at or above $8.5106/share, the value of the Initial Consideration would

remain constant at $100 million. Any further increase in price would be offset by a corresponding decline in the number of shares transferred.

60. The Initial Consideration shares were subject to a Lock-Up Agreement, which placed certain restrictions on T Corp's ability to dispose of the shares. Under the Lock-Up Agreement, the Initial Consideration was divided into three tranches. T Corp could only dispose of the number of shares within each tranche after an agreed upon date, unless it first obtained E*Trade's consent. The first tranche, which constituted 30% of the Initial Consideration, was freely disposable when E*Trade registered the stock with the SEC. Pursuant to Section 5.1(i) of the Merger Agreement, E*Trade was obligated to "use its commercially reasonable efforts to file the Registration Statement as soon as practicable after the Effective Time, but in no event later than 120 days after the Effective Time." The Effective Time was June 3, 2002.

61. The second tranche, which constituted an additional 30% of the Initial Consideration, was freely disposable on or after December 31, 2002. Then, on December 31, 2003, all the remaining shares would be released from the restrictions imposed by the Lock-Up Agreement.

62. The parties also entered into an Escrow Agreement, dated May 31, 2002. Under the Escrow Agreement, approximately 2,350,000 of the shares paid as Initial Consideration would be held in escrow until May 31, 2004 for the satisfaction of any indemnification claims asserted by E*Trade against T Corp.

63. In addition to the Initial Consideration, the Merger Agreement also provided for payment to T Corp of additional stock then valued at $180 million (and recently worth $300 million) in contingent consideration. Pursuant to Section 1.18 of the Merger Agreement, T Corp would be entitled to this additional consideration only if the Acquired

Companies reached established revenue targets during 2002 and 2003.  As E*Trade well knew, however, based upon Momentum's past performance under Mr. Amanat, the Acquired Companies were almost certain to satisfy the requirements of the Earn-Out (absent improper interference and misconduct by E*Trade).

64.     In order to receive the benefits of the Earn-Out, the Acquired Companies had to generate revenues of only $30 million in 2002 (July 1, 2002 through December 31, 2002) and $60 million in the 2003 calendar year.  Momentum had generated revenues of $140 million in 2000 and $121 million in 2001.  Thus, the revenue targets were easily attainable. Furthermore, E*Trade repeatedly represented to T Corp prior to the merger that it was engaged in the process of "rolling up" the active trading industry (buying up small brokerage firms which specialized in providing access to active-traders), which would have further enhanced T Corp's ability to achieve the Earn-Out by expanding Momentum's customer base.

65.     In addition, the Merger Agreement itself contained several provisions which were intended to facilitate T Corp's ability to meet the requirements of the Earn-Out. First, the Merger Agreement contained a Management Retention Agreement ("MRA"), which provided that Mr. Amanat would retain day-to-day control over the operations of Momentum until the end of the Earn-Out period.

66.     While Mr. Amanat was to report to Stephen Ehrlich, Schedule 1.18(e)(e) of the Merger Agreement granted Mr. Amanat the power (over and above the powers granted in the MRA) to establish new relationships and attract new business to the Acquired Companies (subject to E*Trade approval).   Under Schedule 1.18(e)(d) of the Merger Agreement, Mr. Amanat was also empowered to: (a) hire employees; (b) dismiss employees; and (c) determine compensation levels for employees of the Acquired Companies.  Section 5.7 of the Merger Agreement further provided for the establishment of a two person "Operating Committee"

(comprised of Mr. Amanat and an E*Trade executive) to resolve any post-closing management or integration matters between T Corp and E*Trade.  T Corp specifically bargained for these protections knowing full well that its ability to obtain the Earn-Out would depend on the success of its former subsidiary, and Mr. Amanat's ability to monitor Momentum to ensure that it was on the right track to continue successfully in the future just as it had in the past.

67.     Pursuant to the MRA, Mr. Amanat asked to be paid an annual base salary of just $50,000, with an annual target bonus of 40% of base salary.  Clearly, Mr. Amanat's incentive was not the salary or bonus compensation he could earn with E*Trade, but rather the compensation that T Corp would receive upon attaining the Earn-Out milestones.  E*Trade itself acknowledged the importance of these protections, stating that Mr. Amanat and his expertise were critical to the integration of the Tradescape businesses and the potential for the achieving the Earn-Out.  Indeed, Jarrett Lilien even stated that the success of the Tradescape acquisition depended upon retaining Mr. Amanat.

68.     Second, Schedule 1.18(e)(c) of the Merger Agreement provided that the "Parent shall permit the Target Companies to operate and conduct their business and development activities in the ordinary course, consistent with past practice."  Momentum had achieved tremendous success in the months preceding the merger, and T Corp believed that it would continue to succeed if it maintained the same business plan it had under Mr. Amanat's leadership.

69.     Momentum's "past practice" included maintaining and expanding its profitable relationship with MarketXT.  As a means of attracting order flow, MarketXT provided cash rebates to Momentum customers who placed their transactions with MarketXT.  As part of this program MarketXT would pay traders a few tenths of a cent per share for placing any buy or sell orders on MarketXT.  Momentum, whose client base including included professional traders

with very high trading volume, was able to direct substantial volume to MarketXT in exchange for rebates from MarketXT to Momentum.  A significant portion of Momentum's overall pre-merger revenues were derived from MarketXT rebates.

70.    Third, Schedule 1.18(e)(g) of the Merger Agreement provided that the "Parent shall use its commercially reasonable efforts to refrain from taking any action which would impair the ability of Target Companies to reach the Target Revenue and Net Income thresholds established pursuant to the agreement."   This provision provided T Corp with protection against unwarranted interference with its ability to obtain the contingent portion of the compensation due under the Merger Agreement.

71.    As described below, E*Trade breached all of the foregoing provisions, and the covenant of good faith and fair dealing implied in all  Delaware contracts, in the course of purposefully and systematically frustrating Plaintiffs' ability to satisfy the requirements for obtaining the Earn-Out.

### C.    Softbank and E*Trade Fail To Disclose Cotsakos' Compensation To T Corp And Then Compel T Corp To Close The Sale Transaction With E*Trade

72.    On April 30, just three weeks after T Corp had executed the Merger Agreement with E*Trade, E*Trade publicly announced that its 2001 financials failed to disclose that it had paid Cotsakos nearly $90 million in compensation in 2001, even though E*Trade reported losses of approximately $240 million during the same period.  This $90 million compensation package, which was more than double the combined compensation in 2001 of the chief executives of Merrill Lynch, Goldman Sachs, and E*Trade rival Ameritrade, made Mr. Cotsakos the highest-paid CEO on Wall Street, even as E*Trade sustained heavy losses.

73.    As reported on the front page of the Wall Street Journal: "'What did he do, get the stock to go from $6 to $7?' asked Reilly Tierney, an analyst at Fox-Pitt-Kelton.  Not far

off.  The firm's shares rose about $2.75 last year to close the year at $10.25.  However, they since

have fallen.  In 4 p.m. New York Stock Exchange composite trading yesterday, the shares were

changing hands at $7.54, up 29 cents, and they remain far below the firm's record high of about

$70 reached in April 1999.  'That is beyond outrageous'.  Mr. Tierney said."

74.     E*Trade initially disclosed Cotsakos' lavish compensation package in its

2001 Proxy Statement, which was filed on April 30, 2002.  In the wake of this news, which had

not been disclosed to T Corp during the course of the merger negotiations, and which was not

revealed in any of E*Trade's prior regulatory filings, the price of E*Trade stock fell another 20%

from approximately $7.50 on April 30 to $6.12 per share on May 10.  In light of this crisis, Mr.

Amanat repeatedly expressed his outrage and called for Cotsakos to step down as E*Trade's

CEO, but these calls went unheeded.

75.     By the time the Merger Agreement closed on June 3, the price of E*Trade

stock had fallen to $6.04 per share.  Due to the collar on the Initial Consideration, which

provided that T Corp would not receive any additional shares if the price fell below $8.5106,

E*Trade's concealment of Cotsakos' compensation package effectively cost T Corp at least $30

million.  As a result of this disclosure, the approximately 11,750,000 shares of E*Trade stock

paid as Initial Consideration were trading at only $6.04 per share.  Thus, T Corp only received

$70 million in Initial Consideration, instead of the $100 million (or 16.5 million shares) it should

have received absent being fraudulently induced to agree to the collar.

76.     Amid this scandal, and in an effort to contain the public furor over his pay

package, E*Trade announced on May 10, 2002 that Mr. Cotsakos would forfeit $21 million of

his compensation from 2001.  In addition, Mr. Cotsakos entered into a new two year contract

under which he would receive zero in base salary, with bonuses tied exclusively to performance

objectives.  However, the price of E*Trade shares continued to decline, falling to $4.49 per share

by January 25, 2003, the day on which Mr. Cotsakos resigned from E*Trade.   While the company gave no reason for Cotsakos' sudden departure, there was widespread speculation that Cotsakos' lavish pay package and corporate governance issues were hanging over the diversified online broker.   In addition, in November 2002, it was reported that Cotsakos had an additional $27 million in improper loans due to E*Trade, which Cotsakos paid off by forcing the company to buy back stock from him at an artificially high price ($5.70/share at a time when the shares were actually trading at $4.70/share).   This announcement further depressed the price of E*Trade stock, as industry analyst Richard Repetto publicly warned investors of the "corporate governance penalty" being paid by E*Trade in the form of a lower stock price.

77.   The fall-out from this grossly excessive compensation package – which was never disclosed to T Corp in the course of its dealings with E*Trade – continues to this day. Just recently the New York Times reported that Mr. Cotsakos was forced to repay $4.6 million for unapproved gifts and travel he received and/or misappropriated during his seven-year tenure with the company.

78.   Had E*Trade or Softbank disclosed to T Corp (and the public) the size of Cotsakos' compensation package prior to entering into the Merger Agreement, T Corp would not have agreed to sell the Acquired Companies to E*Trade, and certainly not on the terms reflected in the Merger Agreement (including the collar).   Moreover, Softbank, which compelled T Corp to enter into the Merger Agreement in breach of its fiduciary duties, undoubtedly knew about this compensation arrangement but failed to alert T Corp, given that Softbank's designee to the E*Trade Board, Ronald Fisher, the Vice-Chairman of Softbank Holdings, Inc., was on the Board's compensation committee, and that $15 million of the compensation E*Trade agreed to pay Cotsakos was used to purchase Softbank stock in a private transaction.   Defendants' failure

to disclose these and other material facts to T Corp prior to execution of the Merger Agreement caused T Corp to enter into that Agreement and it has suffered substantial injuries as a result.

79.    Upon learning for the first time, along with the rest of the investing public, of Cotsakos' compensation package and observing the value of the equity received in T Corp's sale to E*Trade decline substantially (i.e., the value of the deal dropped by $100 million), Mr. McLaughlin contacted representatives from Schwab regarding their prior $200 million acquisition proposal.  When Schwab refused to explore such a transaction unless T Corp could terminate the existing Merger Agreement, Softbank, in breach of its fiduciary duties, again intervened to ensure that the transaction with E*Trade closed.

80.    As it did in March 2002, Softbank again in early May informed Mr. Amanat that it would not release its lien on T Corp's intellectual property other than in connection with a sale to E*Trade.  Softbank further indicated that it would accelerate all outstanding debt owed by T Corp to Softbank and put T Corp into financial jeopardy if T Corp did not close the deal with E*Trade and pledge all of the Initial Consideration shares as security for its existing debts to Softbank.

81.    On June 3, 2002, with the knowledge that Softbank would block any attempt to sell to a purchaser other than E*Trade, and with E*Trade fraudulently attempting to convince Mr. Amanat that (i) he would not face any further interference from Cotsakos; and (ii) that E*Trade was committed to helping T Corp reach the Earn-Out, T Corp closed the merger with E*Trade.

### D.  E*Trade And Softbank Conspire To Deprive T Corp Of The Benefits Of The Merger Agreement And To Eliminate MarketXT

### 1.    Bogus Claims That T Corp Owes Millions of Dollars In Pre-Closing Expenses

82.     Having acquired the Momentum business through fraud and Softbank's use of its position of trust vis a vis T Corp, E*Trade then embarked on a campaign to ensure that Momentum did not satisfy the revenue targets necessary to obtain the Earn-Out.

83.     First, E*Trade concocted a scheme to declare T Corp in violation of the Merger Agreement.  On May 29, 2002, Momentum's Treasurer and Financial Principal Bryan Polozola had informed Mr. Amanat and Dan Ryan, T Corp's CAO, via e-mail that Momentum had excess net capital of approximately $1.4 million.  Since the Merger Agreement did not require T Corp to leave excess net capital with Momentum, and E*Trade was aware of and never raised a prior objection to T Corp's practice of distributing all excess capital from Momentum to T Corp, T Corp distributed those funds to the parent entity T Corp and used $750,000 to pay an amount owed to Nasdaq on behalf of MarketXT.  Also consistent with its past practice of not leaving extra capital in Momentum, T Corp distributed $5.4 million worth of MarketXT receivables (which in any event had no impact on Momentum's net capital as it was due from an affiliate) to the parent entity T Corp.  As E*Trade well knew, Momentum had similarly distributed almost $30 million in excess capital up to T Corp in the previous year.

84.     Upon learning of this transfer via a phone call from Mr. Polozola on May 29, E*Trade falsely claimed that T Corp's action constituted a violation of the Merger Agreement's covenant to operate in the ordinary course, consistent with past practice during the period between signing (April 10th) and closing (June 3rd).  Even though nothing in the Merger Agreement prohibited T Corp's actions (as stated above, E*Trade was aware of and never raised a prior objection to T Corp's practice of distributing all excess capital from Momentum to T Corp in the period between signing and closing), T Corp's primary concern was to resolve the dispute and proceed with the task of meeting the Earn-Out requirements.  As a result, T Corp agreed to pay Momentum $750,000 to settle the issue (T Corp paid this amount by instructing

Nasdaq to credit to Momentum's account the $750,000 that T Corp had paid on behalf of MarketXT).  Notwithstanding this dispute, E*Trade agreed to close the transaction on June 3, 2002.

85.     Immediately after T Corp transferred ownership to E*Trade – and immediately after T Corp paid $750,000 to resolve the net capital dispute – T Corp was informed by E*Trade that Polozola (who had been working very closely with E*Trade's management since April, and who regarded E*Trade as his employer even before the merger closed) had apparently made a "mistake" in the earlier calculation regarding Momentum's net capital, and that Momentum in fact only had $600,000 in excess net capital at the end of May 2002.  Because T Corp had removed $1.4 million from Momentum in May (and only replaced $750,000 of that $1.4 million), E*Trade asserted that Momentum was operating with a net capital deficiency in violation of the Merger Agreement and threatened to terminate that agreement unless the capital was restored.  T Corp agreed in good faith to consider that course of action, and the parties met several times to discuss this matter and determine what exactly the deficiency was, if any, and how it would be resolved.  E*Trade provided several versions of the calculations to T Corp but could not explain many of its adjustments.  In addition, many of E*Trade's adjustments included items that were  not recorded in accordance with Generally Accepted Accounting Principles ("GAAP").

86.     Then, two weeks later in mid-June, E*Trade suddenly claimed that T Corp was liable for an additional $5 million in pre-closing expenses supposedly incurred by Momentum.  In a conversation with Mr. Amanat immediately after the closing (around June 5), however, Mr. Ehrlich admitted that it was E*Trade's practice to "springload" post-acquisition numbers by incorporating many post-acquisition expenses, which would ordinarily be payable by

the buyer (E*Trade), into the pre-closing period.  Almost none of these expenses were properly attributable to the pre-closing period or were T Corp's responsibility.

87.     E*Trade Professional Trading, LLC's CFO Mike Chochon admitted such "springloading" by E*Trade, stating that the only question was how profitable E*Trade wanted to make June look versus July and onwards.  Nevertheless, E*Trade then demanded that T Corp infuse Momentum with sufficient funds (nearly $6 million) to remedy the net capital deficiency existing at Momentum and cover the accounts payable, debts that were E*Trade's responsibility. E*Trade knew that its sole recourse for any undisclosed liabilities under Section 9.2(a) of the Merger Agreement was to seek indemnification from the shares held in escrow (and E*Trade was only entitled indemnification to the extent its losses exceeded $1,000,000), but E*Trade nonetheless demanded that T Corp pay the full $6 million in cash.  At this time E*Trade was desperate to avoid infusing its own cash into Momentum, as E*Trade was already under tremendous scrutiny from investors because of the Cotsakos compensation debacle.  E*Trade knew that if it went to its "treasury" for the nearly $6 million in cash to pay Momentum's debts (which were E*Trade's responsibility, not T Corp's, but which E*Trade was trying to "springload") E*Trade would have to report a lower cash position than it had promised investors, which would cause its stock price to decline even further.

88.     T Corp subsequently would learn that E*Trade concocted these phony demands for payment as part of its scheme – executed with Softbank's assistance – to avoid paying the Earn-Out (while also diverting all the Initial Consideration to Softbank) by ensuring that T Corp and MarketXT were starved for cash and that they never received the funds necessary to continue in operation or to satisfy E*Trade's bogus demands for expenses.

89.     Even though it knew that T Corp was starved for cash at this time, Softbank nonetheless tried to induce T Corp to pay off its existing Softbank loans.  In an effort to

extract every last cent it could from T Corp before T Corp went bankrupt, Softbank, through its

outside counsel, promised that if T Corp would pay off its existing Softbank loans, Softbank

would ensure that E*Trade (in which Softbank held a 25% ownership interest) paid the $180

million due to T Corp under the Earn-Out (even though Softbank knew that E*Trade had no such

intention, and that its conflict was a blatant breach of its fiduciary duties to T Corp).

90.    Despite E*Trade's claims that T Corp fraudulently concealed $5-6 million

in liabilities, E*Trade refused to sell Momentum back to T Corp.  Indeed, when T Corp asked for

rescission of the Merger Agreement and approached several private equity firms interested in

buying Momentum, E*Trade told Scott Appleby and several others that it liked the Momentum

business and solely wanted to get rid of Mr. Amanat (and therefore avoid paying the Earn-Out).

Despite E*Trade's claims to T Corp that it overpaid substantially for the Tradescape businesses,

E*Trade never once wrote down the goodwill it recognized in connection with the acquisition,

accounting treatment required by GAAP if E*Trade truly believed it had overpaid.

## 2.    E*Trade Causes Momentum Not To Accept MarketXT Rebates

91.    As observed, E*Trade and Softbank conspired to "starve" T Corp by

choking off its revenues and access to capital until it was forced out of business or accepted their

onerous settlement terms.  Although the defendants devised numerous ways to achieve that

improper goal, a primary vehicle involved destroying MarketXT.

92.    Specifically, the MarketXT ECN provided its customers, including

Momentum, with cash rebates for placing buy or sell orders on MarketXT – in effect, rewarding

its customers for using MarketXT as opposed to another ECN (known in industry parlance as

"payment for order flow").  Prior to the merger, MarketXT provided the largest rebates of any

ECN, and these rebates constituted a significant portion of Momentum's pre-merger revenues –

revenues that would help Momentum satisfy the Earn-Out requirements in the Merger Agreement.  MarketXT in the process became the second or third largest ECN, trading roughly 10% of Nasdaq's daily volume, and according to a JP Morgan research report, became the fastest growing electronic brokerage firm in the industry in 2002.

93.     MarketXT also received favorable reviews in both the New York Times and Wall Street Journal, as well as in industry publications, for its innovative and groundbreaking "Get Paid to Trade" rebate program.  At this point MarketXT had surpassed Archipelago, the ECN affiliated with E*Trade, in terms of daily trading volume.  Archipelago recently filed a public offering valuing itself at over $1 billion, after E*Trade destroyed its competitor MarketXT.

94.     To ensure that Momentum was deprived of these revenues and the ability to meet the Earn-Out targets, E*Trade and Softbank, in violation of the Merger Agreement, embarked on a campaign to destroy MarketXT.  Specifically, Stephen Ehrlich, the CFO of E*Trade's Institutional Services division, and the newly appointed CEO of Momentum (E*Trade Professional Trading, LLC), sent an e-mail on June 18, 2002 (only days after the E*Trade-T Corp transaction closed) to various E*Trade employees actively encouraging them not to use MarketXT:  "We have to move away from reliance on xt and I want to do it asap."  In a later e-mail, on June 23, Ehrlich outright directed E*Trade employees to immediately halt Momentum customers from trading on MarketXT.  Then, on June 24, 2002, E*Trade forced all Momentum customers that had been placing their orders on MarketXT to sign a document terminating any further rights to receive MarketXT rebates.  This forced many customers to switch to other ECNs which did not pay rebates as large as MarketXT, such as Archipelago, in which E*Trade owned a substantial interest, and on whose Board of Directors E*Trade had appointed a representative (Jarrett Lilien).

95.     Since MarketXT provided larger rebates than other ECNs, and a large percentage of Momentum trades were executed through MarketXT, this change in policy -- which had no purpose other than to deny T Corp the Earn-Out -- reduced Momentum's overall revenues and thereby hindered T Corp's efforts to meet the requirements of the Earn-Out.  In addition, by deviating from the past business practice of Momentum so as to decrease its revenues, this policy also violated Schedule 1.18(e)(c) of the Merger Agreement, which provides that "Parent shall permit the Target Companies to operate and conduct their business and development activities in the ordinary course, consistent with past practice."

3.     **E*Trade And Softbank Conspire To Have the NASD Shut Down MarketXT**

96.     On or about July 1, 2002, in a scheme to avoid having to infuse any of its own cash into Momentum prior to reporting its second quarter earnings, E*Trade filed for an extension of time to file its NASD focus report, claiming that Momentum's net capital position was "unclear" and required "further review."   E*Trade then concocted a plan to approach the NASD and blame this situation on T Corp and MarketXT.  Fictitiously claiming that MarketXT still owed Momentum $5.4 million in rebates as of May 31 (that E*Trade clearly knew had already been distributed to the parent entity T Corp  prior to closing), E*Trade informed the NASD that Momentum and MarketXT were operating at a net capital deficiency (Momentum by virtue of the expenses that were allegedly accrued pre-merger, and MarketXT by virtue of the $5.4 million in rebates it still supposedly owed to Momentum).

97.     To further exacerbate MarketXT's net capital situation, E*Trade instructed two of its affiliates, Dempsey & Co. LLC ("Dempsey", a wholly owned E*Trade subsidiary) and Archipelago (in which E*Trade owned a substantial equity interest, and to whose Board of Directors E*Trade had appointed Mr. Lilien), not to repay substantial debts – totaling

approximately $8 million – they owed to MarketXT.  Having created a perceived net capital

deficiency and presented this situation to the NASD, Defendants were successful in further

damaging MarketXT: the NASD instructed MarketXT to cease conducting business  unless T

Corp infused it with $4 million in capital.

98.     In order to avoid a confrontation with the NASD and to keep MarketXT in

operation, Mr. Amanat once again approached Softbank about obtaining a loan so that MarketXT

could cure the NASD's perceived net capital deficiency and continue operations.  T Corp sent

Softbank a letter asking that it either lend T Corp $5 million or release its lien on one million

shares of the Initial Consideration so that those shares could be used as collateral for a loan from

another willing lender.  Previously, in connection with an offer to help T Corp in its negotiations

with E*Trade (after Mr. Amanat had been terminated), Softbank had demanded that Mr. Amanat

first sign a custody agreement in connection with an unrelated loan from Softbank.  The existing

loan, which was extended in May 2002, had a principal of $5 million and was secured by giving

custody of the E*Trade shares obtained in the merger to Softbank's control.  Mr. Amanat

executed the custody agreement with Softbank on July 25, 2002 (the document was dated July

18, but not signed until July 25), the day after his wrongful termination by E*Trade.  This

agreement provided that the 9,400,042 E*Trade shares which were not subject to the Escrow

Agreement, and which were paid as Initial Consideration, would be held in the custody of

Donaldson, Lufkin & Jenrette Securities Corporation, and could not be sold until T Corp fully

repaid its obligations to Softbank.

99.     After Mr. Amanat signed the custody agreement, and despite assurances

that Softbank then would continue to finance T Corp as it had before, Softbank refused to loan T

Corp the money or free up the shares – in breach of its fiduciary duty and its oral commitments

to T Corp.  As T Corp would later learn, Softbank and E*Trade had conspired to ensure that T

Corp never obtained the funds to cure the NASD's concerns over MarketXT's net capital in an effort to drive it out of business.

### 4. E*Trade Breaches The Merger Agreement By Failing To Register The Initial Consideration Shares

100. Notwithstanding Softbank's refusal to extend a loan, T Corp made every effort to eliminate the alleged net capital deficiency involving MarketXT, but yet again was thwarted by E*Trade's misconduct. To bolster MarketXT's net capital T Corp had previously entered into an industry standard assumption agreement with MarketXT whereby T Corp assumed all its subsidiary's liabilities. However, the NASD concluded that this agreement was invalid because, after the merger, T Corp was essentially a holding company whose only asset other than MarketXT was E*Trade stock, and that stock was not registered. E*Trade, however, had been contractually obligated to register the Initial Consideration shares by this time but had failed to do so.

101. Pursuant to Section 5.1(i) of the Merger Agreement, E*Trade was required to "use its commercially reasonable efforts to file the Registration Statement as soon as practicable after the Effective Time, but in no event later than 120 days after the Effective Time." The Effective Time is defined in Section 1.2 of the Merger Agreement as the date on which the Certificate of Merger was filed with the Delaware Secretary of State. This certificate was filed on June 3, 2002, the closing date of the merger, thus requiring E*Trade to fully register the Initial Consideration shares at the latest on or around October 3, 2003.

102. In yet another breach of the Merger Agreement, E*Trade did not use "commercially reasonable efforts" to file the registration statement "as soon as practicable after the Effective Time." In fact, E*Trade baselessly threatened and in fact informed regulators that it might never register the shares. Since these shares were unregistered at the time of the NASD

investigation (that was initiated by E*Trade) due to E*Trade's breach of its obligations to register such shares "as soon as practicable," the NASD concluded that the Assumption Agreement did not cure MarketXT's net capital deficiency. Further, as a result of the $5.4 million in payables that E*Trade falsely claimed MarketXT still owed to Momentum, the NASD (as note above) instructed MarketXT to cease operations until it could obtain additional capital.

**5.      E*Trade Illegally Denies MarketXT Access To Its Computer Network**

103.    T Corp did not stop its efforts to keep MarketXT in business with the Assumption Agreement.  Instead, after Softbank reneged on its promise to extend a loan in exchange for executing the Custody Agreement, Mr. Amanat located IIG, which signed an agreement to lend T Corp $7 million – funds that were more than sufficient to keep MarketXT in business and satisfy its regulators.  However, E*Trade and Softbank conspired to frustrate that loan.

104.    As a condition to closing the loan IIG demanded that T Corp demonstrate that MarketXT have access to its data center – the essential ingredient of an ECN.  Both before and after the merger MarketXT and Momentum (renamed E*Trade Professional Trading, LLC after the merger) operated from a shared infrastructure, most of which was physically located on what was now ostensibly E*Trade's premises (since T Corp had assigned the lease for that office space to E*Trade as part of the Merger Agreement).  The parties had agreed that MarketXT would have access to the shared infrastructure until it could complete its migration plan.  This migration was originally supposed to be complete by August 31, but the deadline was subsequently extended until September 30, 2002, and could be extended in good faith as necessary.

105.    On August 26, E*Trade prevented MarketXT from accessing its network or the data center.  In addition to denying MarketXT access to the network, E*Trade also confiscated and took possession of all T Corp's electronic files, including e-mails, financial data, attorney-client privileged documents, and proprietary intellectual property records, as well as roughly $10 million worth of hardware and software.  E*Trade also denied MarketXT access to its crucial Nasdaq lines, effectively cutting off any chance that MarketXT could re-start.  By denying MarketXT access to its network, E*Trade essentially shut MarketXT down, and prevented T Corp from obtaining the IIG loan.

106.    In short, E*Trade and Softbank's scheme worked as planned: they put MarketXT out of business and frustrated all of T Corp's efforts to obtain the funds necessary to address MarketXT's net capital issues and restart MarketXT.  In achieving this improper end, E*Trade eliminated a competitor to its Archipelago and Dempsey affiliates and further hindered T Corp's ability to meet the Earn-Out requirements.

**6.      E*Trade Prevents Mr. Amanat From Operating Momentum And Then Terminates Mr. Amanat Without "Cause"**

107.    While the Merger Agreement and MRA acknowledged that Mr. Amanat would play a critical role in the daily operation of the Acquired Companies, E*Trade deliberately thwarted his efforts to bring new trading opportunities to Momentum.  On the few occasions when E*Trade did pursue such business opportunities, it intentionally excluded Mr. Amanat from discussions with the prospective clients.  E*Trade also refused to convene the Operating Committee established by the Merger Agreement to resolve any post-closing management or integration matters.  On the one occasion when the Committee was supposed to meet, Stephen Ehrlich threw Mr. Amanat out of his office and refused to speak to him.

108.   E*Trade also interfered with Mr. Amanat's ability to run the day to day operations of Momentum in several ways.  First, E*Trade excluded Mr. Amanat from a pricing committee established to evaluate potential clients.   Second, communications between Mr. Amanat's direct reports and E*Trade management excluded Mr. Amanat.   This course of conduct alienated Mr. Amanat from his own direct reports, and led these direct reports to believe that they no longer worked for Mr. Amanat.   Third, Mr. Amanat was evicted from his office (which was usurped by Lilien) and his executive assistant was forced to become an E*Trade receptionist.  Finally, E*Trade gave customers the impression that Mr. Amanat had no authority over the day to day operations of the Acquired Companies.

109.   Not content with the foregoing misconduct, E*Trade terminated Mr. Amanat without warning during a meeting on July 24, 2002, just seven weeks after the merger closed.  When Mr. Amanat arrived for that meeting he was confronted by a room full of E*Trade executives, along with E*Trade's in-house and outside counsel, all of whom were intent on extorting Mr. Amanat into agreeing to a number of unfavorable changes to the Merger Agreement.  E*Trade threatened to initiate criminal proceedings against Mr. Amanat, file a $50 million civil lawsuit against him, his family and T Corp, and intentionally file a false and defamatory Form U-5 form (a form filed upon leaving the employment of a broker-dealer) with the NASD so that he would never work in the securities industry again, if he did not agree within 48 hours of the meeting to: (1) return 50% of the purchase price paid for the Acquired Companies; (2) return $8-10 million cash; and (3) relinquish T Corp's right to the Earn-Out.  In order to exert further pressure on Mr. Amanat to forfeit T Corp's rights under the Merger Agreement, outside counsel for E*Trade explicitly stated that E*Trade had no problem accusing Mr. Amanat of conduct in its Form U-5 filing that it could not assert in good faith in a complaint:

The Complaint, and let me start by saying I divided the world into two parts. There are things that we prepare in good faith, and to allege in a complaint consistent with our obligations under Rule 11, which in English, Omar, means we have investigated, we think we have a good faith basis to allege it. Whether ultimately we can convince a court or whether you convince a court may be a different issue.

But what I am going to go through with you is the essence of what we would be prepared to allege in the event we cannot get this thing resolved. It is not; the other half of the world is what we would feel strongly enough about to be able to include in a Form U-5. That is something we have, in my view, a sort of different level of certainty to.

At this meeting E*Trade also informed Mr. Amanat that his name had come up in relation to a regulatory investigation of trading activity in March 2002. E*Trade stated that the regulators had not indicated that they had any concern with Mr. Amanat at that time, but E*Trade was sure that the NASD would become concerned with him once E*Trade filed the Form U-5.

110. This wrongful termination constituted a breach of Mr. Amanat's MRA, incorporated into the Merger Agreement as Exhibit A thereto, which only provided for termination for "cause". Specifically, pursuant to the Term of Employment section of the MRA, termination for "cause" means "a termination for any of the following reasons: "(i) your failure to materially perform your duties, which failure continues for 20 days after your receipt of notice from the Company specifying such failure to perform; (ii) your refusal to materially perform those duties that may be reasonably expected by the Company; (iii) your engaging in conduct prohibited under E*Trade's 'Code of Professional Conduct'; (iv) your being disqualified from membership in or association with a member of the National Association of Securities Dealers or any equivalent body; or (v) a material breach of this agreement or any confidentiality or proprietary information agreement between you and the Company."

111.    However, E*Trade never provided valid "cause" for Mr. Amanat's termination as required under the MRA.  Instead, after throwing Mr. Amanat out of its offices, E*Trade executives defamed Mr. Amanat's reputation, falsely stating to other Momentum employees that he had been led out in handcuffs, and otherwise implying that he had been involved in criminal activity.  E*Trade never filed the civil complaint that was shown to him at the July 24 meeting, and no criminal investigation was ever commenced.

112.    By terminating Mr. Amanat without cause, E*Trade not only breached the MRA and the provisions of the Merger Agreement regarding the operation of Momentum and Mr. Amanat's role in connection therewith, but it also inhibited T Corp's ability to meet the conditions of the Earn-Out, as Mr. Amanat was thereafter prevented from bringing new business opportunities to Momentum.  In this manner, E*Trade furthered its scheme of ensuring that T Corp would not meet the Earn-Out targets.

113.    In addition to Mr. Amanat, E*Trade also permanently damaged the heralded Tradescape technology, by far its most important asset, by terminating the employment of Tradescape's two most important technology personnel.  First, E*Trade permanently damaged Tradescape's core competency by refusing to retain Eugene Podorbunsky, the lead developer of its coveted Lightspeed technology.  To make matters worse, this allowed Mr. Podorbunsky and many key clients to defect to archrival Andover.  Second, E*Trade fired Chief Technology Officer Irfan Amanat (who had developed the entire Tradescape software system since its inception) after he was discovered to be helping Fountainhead, a hedge fund who had committed to helping T Corp achieve the Earn-Out, become a Momentum client.  Both of these terminations furthered E*Trade's scheme to prevent T Corp from achieving the Earn-Out.

7.      **E\*Trade Enters Into And Then Breaches An Agreement Granting T Corp Access To MarketXT's Own Proprietary Materials and Data Center and Returning Monies Indisputably Owed To T Corp By E\*Trade**

114.    In order to prevent T Corp from accepting an offer of investment from Fortress Capital that would have infused MarketXT with the $4 million it needed to satisfy NASD concerns and resume operations, E\*Trade fraudulently induced T Corp into executing an agreement (the "Standstill Agreement"), dated September 13, 2002, in which E\*Trade promised to provide T Corp with the capital required by MarketXT and permit T Corp access to all its software, hardware and intellectual property (which E\*Trade had wrongfully stolen from T Corp and barred it from accessing).  Under this agreement, the E\*Trade shares held in escrow under the Escrow Agreement would be liquidated to provide E\*Trade with a cash payment of $7 million, with the remaining $1.8 million payable to T Corp.  This $7 million payment was in satisfaction of Momentum's alleged pre-closing liabilities.

115.    Notwithstanding this agreement, however, E\*Trade never paid T Corp the $4 million, and it continued to improperly deny T Corp access to the software and intellectual property that were crucial to restarting MarketXT.

116.    Pursuant to Section 3.2 of the Standstill Agreement, E\*Trade had an obligation to return all of T Corp's hardware and software "as soon as reasonably practicable following the Closing date (but no later than 5:00 p.m., Friday, September 20th, 2002)." However, E\*Trade did not deliver the necessary equipment on September 20, nor did E\*trade use its reasonable efforts to accomplish the task in good faith.  Instead, E\*Trade intentionally deprived T Corp of access to the hardware and software for as long as possible, and specifically told T Corp employees that "[i]f T Corp wants the hardware it should go get the sheriff."

117.    In addition to denying T Corp access to its equipment, E\*Trade also failed to comply with Section 1.6 of the Standstill Agreement.  That provision imposed a duty on

E*Trade to facilitate the return to T Corp of a $2.2 million security deposit held by the landlord at T Corp's former office space at 135 East 57th Street (the space which E*Trade moved into after the merger, and which contained the infrastructure previously shared by MarketXT and Momentum).   Under this provision, E*Trade was obligated to post its letter of credit to the landlord no later than ten business days after the execution of the agreement.  Not surprisingly, E*Trade did not post an acceptable letter of credit to the landlord by the deadline established in the Standstill Agreement (September 23, 2002).  Indeed, E*Trade did not facilitate the return of T Corp's security deposit until the summer of 2003, when it was too late to help re-capitalize MarketXT (which was the primary reason T Corp had executed the September 13 agreement).

118.   Without access to its valuable intellectual property, a data center, or necessary capital – all of which had been denied to T Corp through the wrongdoing of E*Trade and Softbank – MarketXT finally capitulated.  On November 15, 2002, MarketXT was forced to lay off all 45 of its employees and shut down permanently.

**8.   E*Trade Further Hinders T Corp's Ability To Achieve The Earn-Out By Preventing Mr. Amanat From Bringing New Business Opportunities To Momentum**

119.   During the winter of 2002-2003 Mr. Amanat remained undeterred and continued to present new business opportunities to E*Trade.   To prevent Momentum from meeting the revenue targets required for the Earn-Out, however, E*Trade wrongfully and in breach of the Merger Agreement rejected this business.  E*Trade also sent T Corp's attorneys a letter on December 4 demanding that Mr. Amanat cease and desist his attempts to attract new clients for Momentum.

120.   For instance, in November and December of 2002 Mr. Amanat reached agreements with Fountainhead Capital ("Fountainhead") and Paloma Partners ("Paloma") – a $5 billion hedge fund, and one of the most attractive clients in the securities industry by virtue of its

paying over $75-100 million per year in commissions to Wall Street – to direct a significant volume of trading to Momentum.  E*Trade baselessly refused to accept such business, even though Fountainhead was already connected to the appropriate system and had fully tested Momentum's software.  The Fountainhead agreement would have generated significant order flow for Momentum, but it was nonetheless turned away by E*Trade because accepting the arrangement would have caused Momentum to satisfy the Earn-Out requirements.  Similarly, E*Trade initially refused to meet with or accept business from Paloma, and attempted to scare Paloma away from T Corp by telling Paloma that E*Trade had $50 million in claims against T Corp.

121.    Notwithstanding E*Trade's conduct, Mr. Amanat notified Mr. Ehrlich that he had several additional potential sources of revenue for Momentum, including SAC Capital, Millennium Partners and Stark Investments.  E*Trade failed to even meet with any of these potentially lucrative clients as well.

122.    After doing everything in its power to improperly frustrate T Corp's ability to satisfy the requirements for the Earn-Out, E*Trade, faced with the prospect of either turning away more business (such as Fountainhead) or accepting such business and paying the Earn-Out, cited misconduct by T Corp as excusing any further obligations it had to make any payments under the Earn-Out.  In a letter dated December 27, 2002, counsel for E*Trade stated that:

> What your clients fail to understand is that their actions over the course of the last six months have nullified any putative obligation E*Trade might have to abide by the "earn out" provision of the Merger Agreement....  Thus although E*Trade/Momentum will continue to entertain reasonable business proposals from any source, we believe it is excused from any further performance under the Merger Agreement.

9.    **Softbank, Through Fraud and Coercion, Compels T Corp To Enter Into A
      Settlement Of Litigation Commenced By A Softbank Affiliate**

123.    On January 27, 2003, T Corp was coerced into a settlement of litigation which a Softbank affiliate had initiated against it in September of the previous year.  In early September, Softven, a Japanese partnership affiliated with Softbank, filed a motion for summary judgment in lieu of complaint against T Corp in New York state court.  In that motion Softven alleged that T Corp had defaulted on a promissory note dated August 17, 2000, evidencing an unsecured loan to T Corp in the amount of $10 million.

124.    In the months following the commencement of this litigation, Softbank, which was hemorrhaging cash at an alarming rate (it reportedly lost $500-600 million in 2002), engaged in a series of outrageous extortionate acts which ultimately coerced T Corp into agreeing to a settlement.  First, Robert Takeuchi, one of the representatives Softbank had appointed on the T Corp Board of Directors, called Mr. Amanat's home on or about January 26, 2003 and began threatening Mr. Amanat's life.  This call was heard on speakerphone by Mr. Amanat's wife, Dr. Sabiya Amanat, a Professor at Columbia University's Medical and Dental School.  During that call, Mr. Takeuchi stated that he would be "going after Mr. Amanat and his entire family" and that Softbank had "friends" in Japan who were experts in burying people like Mr. Amanat "ten feet underground" where no one would ever find him.  In conclusion Mr. Takeuchi stated that to avoid this fate Mr. Amanat had to comply with Softbank's demands by, among other things, signing a proposed settlement agreement which would transfer to Softbank, an insider of T Corp's, over $10 million, ahead of countless third party creditors, while extracting a release against all claims that T Corp could bring against it.

125.    Not content with threats of physical violence, Softbank also repeatedly threatened to drive T Corp into bankruptcy unless it executed the settlement agreement.  These

threats of physical and economic harm caused Mr. Amanat and T Corp to execute the settlement agreement.  Under the agreement, T Corp was required to obtain a loan in the maximum possible amount based on T Corp pledging to a lender the 7 million shares of E*Trade stock that were free from the restrictions of the Lockup Agreement.  The settlement agreement also required T Corp to issue two new promissory notes, with a combined principal of $16,119,088.57, to Softbank.  Each note was payable "as soon as practicable" after the earlier of three possible dates: (i) December 31, 2003; (ii) the first date after the execution of a definitive agreement on which the 10 day average trailing closing price of E*Trade Common Stock is at or above $6.50 per share; or (iii) the date that a global settlement with E*Trade is reached which allows for the immediate termination of the lockup agreement.

126.    While these settlement terms were incredibly onerous, in light of Softbank's misconduct and unlawful threats T Corp was coerced, under duress, to execute the agreement in late January 2003.  By virtue of the circumstances in which T Corp executed the settlement agreement – namely, in conjunction with Softbank's threats of physical violence and economic harm – the settlement agreement is null and void and the release given to Softbank therein is invalid.

**10.    E*Trade And Softbank Tortuously Interfere With T Corp's Ability To Obtain Financing**

127.    Then, in March 2003, after the Softbank settlement described above (and outside the scope of the release contained therein, which in any event was procured through fraud and duress and thus is invalid), Softbank and E*Trade engaged in further misconduct directed at T Corp.

128.    Just after the January settlement agreement was executed T Corp attempted to obtain financing from almost every investment bank on Wall Street, including

Deutsche Bank, Credit Suisse First Boston and Smith Barney,  scouring the industry to find anyone willing to provide a loan to pay off Softbank.  The financial institutions contacted by Mr. Amanat all initially agreed to provide loans, subject to speaking with E*Trade's counsel about the restrictions that were placed on T Corp's E*Trade shares.  However, each time E*Trade's counsel spoke to one of the potential lenders that lender would immediately call off the loan citing unresolved disputes between E*Trade and T Corp (that E*Trade had brought to their attention).   E*Trade successfully torpedoed each of these loans by telling the financial institutions that it might "pull the registration statement" on T Corp's E*Trade shares – which were T Corp's only source of collateral – at any time.  According to Bryan Stepanian, a representative of Deutsche Bank, Deutsche Bank spent over $80,000 in legal fees attempting to do a loan for T Corp only to be told by E*Trade's counsel that it would not enable Deutsche Bank to do a loan for T Corp and that E*Trade had "$50 million in claims against T Corp."

129.    After searching the industry for an entity that could provide it with a loan, and faced with increased pressure from Softbank to pay it off, T Corp finally negotiated and signed an agreement to obtain a $12 million loan from Empyrean Inve stment Fund, LLP ("Empyrean") to partially pay off its debt to Softbank (roughly $11.6 million of the funds were supposed to be paid to Softbank).  The intent of T Corp and Empyrean to enter into this loan was memorialized in a Pledge Agreement dated March 28, 2003.  As security for the loan T Corp pledged the 6,700,000 E*Trade shares that were not subject to  any of the restrictions of the Lock-Up Agreement or the Escrow Agreement.  However, on March 28, after Softbank, T Corp and Empyrean had all signed off on the loan, E*Trade, which was concerned that T Corp was finally about to gain access to capital and begin to fend for itself, attempted to prevent the deal from going forward on the agreed-upon terms.  In a conference call between Mitch Caplan, CEO of E*Trade, Russ Elmer, General Counsel for E*Trade, Rauf Ashraf, General Partner of

Empyrean, and outside counsel for Softbank, Mr. Caplan and Mr. Elmer did everything in their

power to ensure either that T Corp did not obtain the loan or obtained it on significantly more

onerous terms.

>    130.    Thus, the representatives of E*Trade on the call repeatedly defamed and

insulted Mr. Amanat's character (as witnessed by Joseph Lerner from CS First Boston and Mr.

Amanat himself), and specifically stated that Mr. Amanat was certain to default on the loan.  For

example, Mitch Caplan stated:

> We have an agreement with T Corp that we still want him to sign,
> and there are other issues that you are not aware of.  And
> mostly because I have zero faith in Omar, I do not trust him.  I am
> convinced that he is going to default on the loan and I am sure he
> is going to have 16 other creditors showing up on Monday, and
> that you are going to be left holding the bag and we are all going to
> be looking to you at the end of the day.

Later in the conversation Mr. Caplan further stated:

> Well believe me- You don't want to get involved in this mess:
> Trust me.  You have no idea what you are getting yourself into.
> You do not want to be involved with Omar.  I have zero faith in
> Omar.  I do not trust him.  He is a bad guy.  If I were you I would
> not have any involvement with him.

>    131.    After Empyrean's Mr. Ashraf exited the call, Mr. Caplan confirmed

defendants' wrongdoing:

> Well, its sounds like if Tradescape is only receiving a small
> amount of money then maybe we can be comfortable with it.  After
> this is resolved, Tradescape will still not be able to survive on its
> own so we can continue to try to get a global settlement that makes
> both of us happy.  I do not want Tradescape receiving funds from
> this loan.

Outside counsel for Softbank, and its representative in virtually all meetings and dealings with T

Corp, then responded:

> Don't worry.  We've got Omar on a very tight leash and <u>he will</u>
> <u>have no choice but to accept a global settlement or face bankruptcy</u>

<u>once again and you have Softbank's commitment to see that
happen once this loan goes through</u>.

132.    As a result of E*Trade and Softbank's tortuous interference with T Corp's
contractual and prospective economic relations with Empyrean (which initially refused to go
forward with the loan after hearing Mr. Caplan's comments), T Corp was forced to renegotiate
the pledge agreement with Empyrean on substantially less favorable terms.  While the original
agreement called for a one year loan with an interest rate of 8% and no prepayment penalty, the
new loan had a 19% interest rate, a four year term, substantial prepayment penalties, and a collar
price of $4.50/share on most of the E*Trade stock.

133.    Having been forced to take the loan on these onerous terms, virtually all
the proceeds of the loan were paid to Softbank.  Based on a loan to value ratio of 50%,
Empyrean initially loaned T Corp approximately $12 million based on T Corp's pledge of
6,700,000 million E*Trade shares.  T Corp then paid Softbank $11.7 million and Appleby
Capital $200,000 with these funds, leaving T Corp with only $100,000.

**11.    <u>E*Trade Misappropriates T Corp. Equipment And Mail</u>**

134.    In May 2003 T Corp first became aware that E*Trade had unlawfully
taken possession of T Corp equipment that had been stored in a warehouse shared with E*Trade.
On May, 19, 2003, Bill Bohm, a MarketXT employee, went to the storage facility to conduct an
inventory of the equipment being stored there.  Upon arrival, Mr. Bohm was informed by the
warehouse manager that E*Trade had sent a representative to the facility two months earlier to
conduct an inspection.  Immediately after that inspection Jim Hurtado of E*Trade called the
warehouse and demanded that three cartons of expensive trading telephone equipment be sent to
E*Trade at 135 East 57th Street, even though the equipment indisputably belonged to MarketXT.
Mr. Bohm also discovered that  telephone turrets, high-end trading technology, a Sub-Zero

refrigerator and a large number of expensive trading desks, among other things, were missing from the storage facility. All told, the missing assets had a fair market value of approximately $750,000.

135. On May 19, 2003, Mr. Bohm confronted Mr. Hurtado about E*Trade's unlawful possession of MarketXT's property. Mr. Hurtado first claimed that he had not taken the equipment. Then he claimed that he had only asked the warehouse to send him the equipment so he could determine if E*Trade should use a similar phone system. Finally Mr. Hurtado claimed that he had never received the equipment from the storage facility, and that he was not responsible for any loss of equipment. Notwithstanding the inconsistent positions taken by Mr. Hurtado during that conversation, E*Trade clearly deprived T Corp of the opportunity to use or sell that equipment for approximately two months, for no other reason than to inflict injury on T Corp (which in fact had located a buyer that was willing to pay several hundred thousand dollars for the telephone equipment).

136. E*Trade also engaged in a policy of unlawfully opening mail addressed to T Corp, MarketXT, Mr. Amanat and John Araneo (T Corp's General Counsel) even after it was warned not to do so on multiple occasions. Specifically, T. Corp sent E*Trade three e-mails (on May 30, 2003, June 12, 2003, and June 30, 2003), as well as one letter (dated July 25, 2003) demanding that E*Trade cease this unlawful conduct. For instance, on June 30, 2003, John Araneo of T Corp sent Stephen Ehrlich an e-mail stating that "I have been advised that our mail (i.e. mail addressed to T Corp., Tradescape Corp., MarketXT, Omar Amanat and my own personal mail) continues to be opened by ET personnel. We have taken steps to stop our mail from being delivered to your office and expect this to stop in the near future. However, can you please direct your staff to NOT open any mail addressed to: (T Corp., or any of its predecessor

entities (not owned by E*Trade); (ii) Omar Amanat; (iii) John T. Araneo or (iv) any other individual working with T Corp. or MarketXT, Inc.?"

137.    This illegal course of conduct persisted for at least two months, during which time E*trade opened general business correspondence, personal mail, confidential regulatory correspondence, as well as privileged and confidential mail from T Corp's outside attorneys.  T Corp sent E*Trade no less than four separate warnings to cease and desist this course of conduct, and E*Trade's only response was a typically dismissive e-mail from Mr. Ehrlich on July 1, 2003, in which he stated: "We will do the best that we can in sorting the mail."

## FIRST CAUSE OF ACTION - FRAUD IN THE SALE OF SECURITIES BY E*TRADE, JARRETT LILIEN, MITCHELL CAPLAN, STEPHEN EHRLICH AND RONALD FISHER

138.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 137 as if set forth fully herein.

139.    Rule 10b-5 provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

140.    As described above, E*Trade, Jarrett Lilien, Mitchell Caplan, Stephen Ehrlich and Ronald Fisher (the "E*Trade Defendants"), directly and indirectly, by the means of instrumentalities of interstate commerce and the mails, engaged and participated in a continuous

course of conduct to misrepresent information regarding E*Trade, and to knowingly and intentionally conceal from T Corp adverse material information about E*Trade and its financial condition, including the exorbitant compensation of its Chief Executive Officer, so as to be permitted to participate in the auction for Tradescape and to induce T Corp to sell to E*Trade. E*Trade had a duty to disclose to T Corp the terms of Mr. Cotsakos' compensation and all other material information concerning E*Trade.

141.    The E*Trade Defendants acted with scienter.  Even though they knew of Mr. Cotsakos' outrageous compensation package and other non-public information regarding E*Trade during the merger negotiations, the E*Trade Defendants knowingly and intentionally concealed that and other information from T Corp, including Cotsakos' involvement in the E*Trade business and E*Trade's willingness permit Mr. Amanat to run the Momentum business post-acquisition, in order to induce T Corp to allow E*Trade to participate in the auction and to sell the Acquired Companies to E*Trade in exchange for E*Trade stock.

142.    Ronald Fisher, the Vice-Chairman of Softbank Holdings, Inc., was a member of the E*Trade Board of Directors, and served on the Board's compensation committee. Thus Softbank, through Mr. Fisher (who Softbank had appointed to the E*Trade Board), had knowledge of Mr. Cotsakos' extravagant compensation package prior to the execution of the Merger Agreement and indeed benefited from the compensation package by having $15 million of it used to purchase Softbank stock in a private transaction.

143.    T Corp relied on the foregoing misstatements and omissions in entering into the Merger Agreement and purchasing E*Trade stock in exchange for the Acquired Companies.  Had E*Trade accurately disclosed this material information prior to the execution of the Merger Agreement, T Corp never would have entered into the Merger Agreement with E*Trade.

144.     These misstatements and omissions plainly were material, as evidenced by, among other things, the fact that the price of E*Trade stock fell by approximately 20% in the ten days following the disclosure of Cotsakos' compensation arrangements, and another 30% before Cotsakos resigned from the company in January 2003.

145.     Plaintiffs have suffered damages as a result of the foregoing misconduct.

## SECOND CAUSE OF ACTION - COMMON LAW FRAUD BY E*TRADE, JARRETT LILIEN, MITCHELL CAPLAN, STEPHEN EHRLICH, SOFTBANK, SOFTBANK CORP., RONALD FISHER AND MASAYOSHI SON

146.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 145 as if set forth fully herein.

147.     During the negotiations leading up to the execution of the Merger Agreement on April 10, 2002, the Defendants, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent information regarding E*Trade, and to conceal adverse material information about E*Trade and its financial condition, including the exorbitant compensation of its Chief Executive Officer so as to be permitted to participate in the auction for Tradescape and to induce T Corp to sell to E*Trade.  E*Trade had a duty to disclose to T Corp the terms of Mr. Cotsakos' compensation and all other material information concerning E*Trade because a special relationship existed between E*Trade and T Corp since E*Trade's aim was to induce T Corp to sell its subsidiaries to E*Trade in exchange for E*Trade stock.

148.     The Defendants acted intentionally in making the false statements and omissions described herein.  Even though they knew of Mr. Cotsakos' outrageous compensation package and other material information regarding E*Trade during the merger negotiations, the Defendants knowingly and intentionally concealed that and other information from T Corp, including Cotsakos' involvement in the business and E*Trades willingness to permit Mr.

Amanat to run the Momentum business post-acquisition, in order to induce T Corp to enter into the Merger Agreement and to sell the Acquired Companies to E*Trade in exchange for E*Trade stock.

149.   T Corp relied on the foregoing misstatements and omissions in entering into the Merger Agreement and purchasing E*Trade stock in exchange for the Acquired Companies.  Had E*Trade accurately disclosed this material information prior to the execution of the Merger Agreement, T Corp never would have entered into the Merger Agreement with E*Trade.

150.   These misstatements and omissions plainly were material, as evidenced by, among other things, the fact that price of E*Trade stock fell by approximately 20% in the ten days following the disclosure of Cotsakos' compensation arrangements, and another 30% before Cotsakos resigned from the company in January 2003.

151.   Son, Softbank and Softbank Corp. conspired with E*Trade by agreeing with E*Trade to conceal the information described herein from T Corp.  For instance, Son, Softbank and Softbank Corp., through Ronald Fisher (a member of Softbank senior management and an E*Trade Board member), knew of Mr. Cotsakos' compensation package, but helped conceal that information from T Corp.  Mr. Fisher served on the Board of Directors of E*Trade, and was appointed to E*Trade's compensation committee prior to the public disclosure of Mr. Cotsakos' compensation.  Softbank was also a beneficiary of Cotsakos' excessive pay package as $15 million of the compensation was used to purchase stock from Softbank in a private transaction.

152.   Defendants' conduct was gross, wanton and willful.

153.   Plaintiffs have suffered damages as a result of the foregoing misconduct.

## THIRD CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION BY E*TRADE, JARRETT LILIEN, MITCHELL CAPLAN, STEPHEN EHRLICH AND RONALD FISHER

154.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 153 as if set forth fully herein.

155.    During the due diligence period (January- March 2002) E*Trade officials directly represented to T Corp that E*Trade's financial statements accurately portrayed its financial condition at that time.

156.    E*Trade knew that T Corp desired all information relevant to E*Trade because the merger consideration consisted entirely of E*Trade stock.

157.    A special relationship existed between E*Trade and T Corp, since E*Trade's "end and aim" in imparting the information was to induce T Corp to change its position by entering into the Merger Agreement.  Thus, E*Trade had a duty to use reasonable care to impart correct information, and T Corp had the right to rely upon the information presented by E*Trade.

158.    The E*Trade Defendants, had they exercised the degree of care that a person of ordinary prudence would exercise, would not have made the misstatements discussed herein.  The E*Trade Defendants made such misstatements in breach of their duty to Plaintiffs.

159.    The representations made by E*Trade were false.

160.    T Corp relied upon these representations in deciding to accept E*Trade's offer to purchase the Tradescape subsidiaries.

161.    The value of the consideration received by T Corp declined substantially when the falsity of these representations was revealed.

162.    Plaintiffs have suffered damages as a result of the foregoing misconduct.

## FOURTH CAUSE OF ACTION- BREACH OF CONTRACT BY E*TRADE, TTH ACQUISITION CORP. AND MHI ACQUISITION CORP.

163.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 162 as if set forth fully herein.

164.    The Merger Agreement is a valid and enforceable contract between E*Trade and T Corp.

165.    Shortly after closing the merger E*Trade instituted a policy of denying rebate payments to Momentum customers who used the MarketXT ECN.  E*Trade also directed employees not to use MarketXT and required customers not to accept rebates from MarketXT. This destroyed the profitable relationship that existed between Momentum and MarketXT, denying Momentum approximately $2-3 million per month in rebates from MarketXT.  Len Purkis, a high level E*Trade executive, confirmed E*Trade's intent when he stated that E*Trade was not going to finance Momentum and MarketXT's business model.

166.    Moreover, knowing that Mr. Amanat's expertise and leadership were critical to Momentum's ability to meet the Earn-Out goals, E*Trade terminated Mr. Amanat without cause, and in violation of the Management Retention Agreement.

167.    This and other conduct violated the Merger Agreement, including: (i) Schedule 1.18(e)(g) of the Merger Agreement, which provides that "Parent shall use its commercially reasonable efforts to refrain from taking any action which would impair the ability of Target Companies to reach the Target Revenue and Net Income thresholds established pursuant to the agreement;" and (ii) Schedule 1.18(e)(c), which provides that "Parent shall permit the Target Companies to operate and conduct their business and development activities in the ordinary course, consistent with past practice."

168.    T Corp has suffered damages as a result of the material breaches of contract described herein.

## FIFTH CAUSE OF ACTION - BREACH OF CONTRACT BY E*TRADE, TTH ACQUISITION CORP. AND MHI ACQUISITION CORP.

169.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 168 as if set forth fully herein.

170.    The Merger Agreement is a valid and enforceable contract between E*Trade and T Corp.

171.    Pursuant to Section 5.1(i) of the Merger Agreement, E*Trade was obligated to "use its commercially reasonable efforts to file the Registration Statement as soon as practicable after the Effective Time, but in no even later than 120 days after the Effective Time".

172.    The Effective Time is defined in Section 1.2 of the Merger Agreement as the date on which the Certificate of Merger was filed with the Delaware Secretary of State.  This certificate was filed on June 3, 2002, the closing date of the merger.

173.    E*Trade breached the Merger Agreement because it did not use "commercially reasonable efforts" to file the registration statement "as soon as practicable after the Effective Time".  Nor did E*Trade comply with its mandate to file within 120 days of the effective date of the merger.  E*Trade did not file the Registration Statement until November 26, 2002, approximately 176 days after the Effective Time.

174.    T Corp has suffered damages as a result of the material breaches of contract described herein.

## SIXTH CAUSE OF ACTION - BREACH OF CONTRACT BY E*TRADE

175.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 174 as if set forth fully herein.

176.   The Standstill Agreement, executed on September 13, 2002, is a valid and enforceable contract between E*Trade and T Corp.

177.   Under Section 3.2 of the Standstill Agreement, E*Trade had an obligation to return all of T Corp's hardware and software "as soon as reasonably practicable following the Closing date (but no later than 5:00 p.m., Friday, September 20th, 2002)."  E*Trade breached the Standstill Agreement because it did not deliver the necessary equipment on September 20. Instead, E*Trade intentionally deprived T Corp of access to the hardware and software for as long as possible.

178.   E*Trade also breached Section 1.6 of the Standstill Agreement, which imposed a duty upon E*Trade to post an acceptable letter of credit no later than September 23, 2002 to 135 East 57th Street LLC in respect of a lease for office space at that location.  E*Trade did not post such letter of credit by September 23, and therefore deprived T Corp of the $2.2 million security deposit it had originally posted for the lease.

179.   T Corp has suffered damages as a result of the material breaches of contract described herein.

## SEVENTH CAUSE OF ACTION - INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE BY ALL DEFENDANTS

180.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 179 as if set forth fully herein.

181.   T Corp negotiated a pledge agreement with Empyrean in March 2003. That agreement would have provided T Corp with a one year loan for approximately $12-$13 million dollars.  The interest rate on the loan was 8%.

182.    While Softbank initially asked E*Trade to allow the loan to go through, Softbank eventually conspired with E*Trade to make sure that T Corp did not receive any benefits thereunder.

183.    When Defendants learned about the pledge agreement they immediately contracted Empyrean.  During a conference call in March, E*Trade and Softbank representatives slandered Mr. Amanat's business reputation and discouraged Empyrean from consummating a loan on the terms set forth in the pledge agreement.  Mitch Caplan, then the CEO of E*Trade, specifically stated that Mr. Amanat and T Corp were certain to default on the loan.

184.    After the Empyrean representative exited the call, Mr. Caplan and outside counsel for Softbank indicated that it was their shared intent to deprive T Corp of any proceeds from the loan and extract a settlement from T Corp.

185.    E*Trade and Softbank had no business justification for interfering in the loan transaction.  Their sole intention was to injure T Corp and prevent it from achieving the Earn-Out targets.

186.    As a result of E*Trade and Softbank's misconduct, Empyrean renegotiated the loan on terms much less favorable to T Corp.  The new agreement called for a four year loan, with a 19% interest rate, substantial prepayment penalties, and a collar at $4.50/share.

187.    The E*Trade Defendants also tortuously interfered with a loan commitment T Corp obtained in August 2002 from IIG.  As a condition to executing that $7 million loan, IIG demanded that T Corp demonstrate that MarketXT had access to a data center.

188.    Even though E*trade and T Corp had agreed to share the data center until at least September 30, 2002, the E*Trade Defendants prevented MarketXT from accessing the network or the data center after August 26, thus preventing T Corp from obtaining any financing from IIG.

189.    T Corp has suffered damages as a result of the misconduct described herein.

## EIGHTH CAUSE OF ACTION - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING BY E*TRADE, JARRETT LILIEN, MITCHELL CAPLAN, STEPHEN EHRLICH AND RONALD FISHER

190.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 189 as if set forth fully herein.

191.    The Merger Agreement is a valid and enforceable contract between E*Trade and T Corp.  Implied in all contracts in Delaware is a covenant of good faith and fair dealing.

192.    Under the Merger Agreement, T Corp had the right to receive a contingent payment of E*Trade stock valued at the time at $180 million dollars.  The payment of this additional consideration was based on Momentum's ability to meet certain revenue thresholds in 2002 and 2003.

193.    E*Trade frustrated Plaintiffs' purpose in entering into the Merger Agreement by, among other things, engaging in misconduct, the goal of which was to deny T Corp the Earn-Out.

194.    In July 2002 E*Trade terminated Mr. Amanat without "cause", even though it previously had acknowledged how important Mr. Amanat was to Momentum's ability to achieve the Earn-Out thresholds.  E*Trade also terminated Momentum's two most experienced technologists soon after the merger, allowing them to defect to rival companies in the industry.  These defections led many profitable clients to leave Momentum, further damaging its ability to obtain the Earn-Out.

195.    Even after his termination, Mr. Amanat contacted several entities, including Paloma Partners, Fountainhead Capital, Millennium Partners, Maple Row Partners, Stark Investments, and Essex Asset Management about bringing their business to Momentum.

196.    Mr. Amanat was able to convince several of these entities to bring significant order flow to Momentum.  However, E*Trade refused to enter into at least one such transaction, and refused to even meet with or consider several others.

197.    These new business opportunities would have enabled Momentum to achieve the thresholds established in the Earn-Out provision, which would have entitled T Corp to the contingent consideration.

198.    E*Trade also eliminated a key source of Momentum revenues by forcing all Momentum customers to sign a document terminating any further rights to MarketXT rebates. This deprived Momentum of $2-3 million in revenues per month, and diminished Momentum's ability to receive the Earn-Out.

199.    Through all of these actions E*Trade frustrated T Corp's ability to realize the benefit of its bargain in connection with the Merger Agreement, in breach of the implied covenant of good faith and fair dealing.

200.    T Corp has suffered damages as a result of E*Trade's material breaches of the covenant of good faith and fair dealing in the Merger Agreement.

## NINTH CAUSE OF ACTION – CONVERSION BY E*TRADE

201.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 200 as if set forth fully herein.

202.    T Corp and MarketXT were the legal owners of various pieces of hardware and software housed in the data center that was supposed to be shared by E*Trade and T Corp.  The E*Trade Defendants intentionally exercised dominion and control over, and

improperly denied Plaintiffs of the use of their property, i.e. the hardware, software and equipment.

203.    The E*Trade Defendants also unlawfully removed certain property which was owned by T Corp from a shared storage warehouse.

204.    T Corp has suffered damages as a result of the intentional misconduct described herein.

## TENTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY BY SOFTBANK, SOFTBANK CORP., MASAYOSHI SON, RONALD FISHER, ROBERT TAKEUCHI AND SHINJI YAMAUCHI

205.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 204 as if set forth fully herein.

206.    Softbank and Softbank Corp. owed a fiduciary duty to T Corp and its stockholders.  This fiduciary duty arose from, among other things, the facts that Softbank: (i) appointed two representatives to the Board of Directors of T Corp, and had its outside counsel attend all meetings of the T Corp Board, thereby gaining access to non-public information regarding T Corp.; (ii) demanded, and had access to, various non-public T Corp financial information, including consolidated statements of income and cash flow, pursuant to Section 10 of T Corp's Stockholders' Agreement, and (iii) controlled T Corp's ability to sell the Acquired Companies through Softbank's lien on T Corp's intellectual property and ownership of almost all of T Corp's preferred stock.  Masayoshi Son and Ronald Fisher had a fiduciary duty to T Corp because they had access, through the Softbank representatives designated to the T Corp Board, to non-public information relating to T Corp.  Takeuchi and Yamauchi had a fiduciary duty to T Corp and its stockholders by virtue of their membership on T Corp's Board of Directors.

207.    Softbank, Softbank Corp, Son, Takeuchi and Yamauchi breached their fiduciary duties by the conduct described herein, including: (i) putting Softbank's own financial

interest ahead of T Corp's in connection with the sale of the Acquired Companies to E*Trade, obstructing T Corp's ability to meet the Earn-Out requirements under the Merger Agreement, interfering with T Corp's ability to obtain financing, and assisting in efforts to harm MarketXT; (ii) refusing to release Softbank's lien on T Corp intellectual property in favor of a sale to any entity other than E*Trade; (iii) threatening to put T Corp into bankruptcy if it did not close a merger transaction with E*Trade; and (iv) threatening to physically harm Mr. Amanat unless he caused T Corp to sign an onerous settlement agreement with Softbank.

208.    T Corp has suffered damages as a result of the breaches of fiduciary duty described herein.

## ELEVENTH CAUSE OF ACTION – BREACH OF CONTRACT BY E*TRADE

209.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 208 as if set forth fully herein.

210.    The 1999 oral agreement between E*Trade and T Corp pursuant to which E*Trade was to buy T Corp is a valid and enforceable contract.

211.    This oral contract required E*Trade to purchase the Acquired Companies for $326 million.

212.    After nearly six months of reassuring Plaintiffs that a transaction would be executed along the lines of the oral agreement reached between Mr. Cotsakos and Mr. Amanat, E*Trade refused to consummate the transaction due to regulatory concerns related to Softbank's ownership interest in T Corp.  No such contingency however, permitted E*Trade under the oral agreement to not proceed due to the hypothetical concerns of regulators.

213.    By not purchasing T Corp at this time, E*Trade materially breached its contractual commitment to T Corp.

214.    Plaintiffs have suffered damages as a result of the material breaches of contract described herein.

## TWELFTH CAUSE OF ACTION – PROMISSORY ESTOPPEL AGAINST E*TRADE, SOFTBANK, AND SOFTBANK CORP.

215.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 214 as if set forth fully herein.

216.    In the event that E*Trade and T Corp did not enter into a binding contract in 2000 whereby T Corp was to sell the Acquired Companies to E*Trade, then E*Trade, Softbank and Softbank Corp., should be estopped from denying the existence of a contract.

217.    E*Trade representatives such as Christos Cotsakos, E*Trade's then Chief Executive Officer, made repeated clear, unambiguous promises to T Corp that E*Trade would purchase the Acquired Companies on terms identical to the oral agreement.

218.    Similarly, Masayoshi Son, the President and Chief Executive Officer of Softbank Corp., made clear, unambiguous promises to T Corp that if E*Trade did not honor its oral contract, Softbank would give T Corp a put option to sell its business to Softbank for $326 million.

219.    Both E*Trade and Softbank reneged on their clear and unambiguous promises and refused to purchase T Corp in 2000.

220.    In reliance on these promises T Corp forfeited the opportunity to sell itself to other interested buyers for hundreds of millions of dollars.   T Corp also complied with E*Trade's requests: (i) not to issue options to any employees; (ii) to put a freeze on the hiring of new employees; and (iii) not to enter into any strategic partnerships that would have grown the T Corp business.   All of these actions were undertaken by T Corp in expectation of closing a sale to E*Trade, and each had an adverse effect on T Corp's business.

221.   E*Trade and Softbank intended and expected T Corp to rely on their promises, and T Corp's reliance on statements made by the two CEOs was reasonable and foreseeable.

222.   Plaintiffs have suffered damages as a result of these misrepresentations.

## THIRTEENTH CAUSE OF ACTION – COMMON LAW FRAUD BY E*TRADE, SOFTBANK, SOFTBANK CORP. AND MASAYOSHI SON

223.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 222 as if set forth fully herein.

224.   During the six month period in 1999 in which T Corp negotiated the sale of its business to E*Trade, E*Trade directly and indirectly, engaged in a continuous course of conduct to conceal material adverse information about E*Trade, including the fact that federal banking regulators from the Office of Thrift Supervision were concerned about Softbank's ownership interest in E*Trade.

225.   During this interval, E*Trade was also actively pursuing an acquisition of Telebanc.  Unbeknownst to T Corp, the Telebanc acquisition was being delayed (for nearly a year) by OTS regulators who were concerned about the undue influence of a foreign entity (Softbank, which owned approximately 25% of E*Trade) over a domestic bank.

226.   Mr. Cotsakos repeatedly represented to Mr. Amanat during this period that the delay in the Telebanc acquisition was caused only by standard due diligence issues.  Mr. Cotsakos never once revealed that the real reason for the delay was Softbank's ownership interest in E*Trade.

227.   E*Trade, Softbank, Softbank Corp. and Son acted intentionally in making the false statements and omissions described herein.  Even though they knew that regulatory issues were the real reason for the delay in the Telebanc acquisition, and that similar regulatory

concerns would prevent E*Trade from acquiring T Corp (because of Softbank's substantial ownership interest in both companies), E*Trade, Softbank, Softbank Corp. and Son intentionally concealed that information from T Corp in order to induce it to forego the other acquisition offers it had received.

228.   In addition, in this period Son stated that he and Softbank were so confident that E*Trade would purchase Tradescape that Softbank would give T Corp a put option requiring Softbank to purchase Tradescape for $326 million if E*Trade failed to honor its commitments. This statement was knowingly false.  Softbank and Son never had any intention of honoring such a put option, and in fact they never have.

229.   T Corp relied on these misstatements and omissions in rejecting other acquisition offers (from Ameritrade and Schwab) and continuing to negotiate in good faith with E*Trade.  Had E*Trade disclosed the fact that regulatory issues were preventing the Telebanc acquisition from closing, T Corp would not have continued to negotiate with E*Trade.

230.   These misstatements and omissions were plainly material, as they related to E*Trade's ability to consummate the acquisition of T Corp.

231.   Mr. Amanat learned only after E*Trade reneged on its promises to buy T Corp that the same regulatory issues that delayed the Telebanc acquisition were also the reason why E*Trade did not purchase T Corp.

232.   Defendants conduct was gross, wanton and willful.

233.   Plaintiffs have suffered damages as a result of the foregoing misconduct.

## **<u>JURY TRIAL DEMAND</u>**

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, T Corp and MarketXT respectfully pray for judgment against Defendants as follows:

(i) Awarding Plaintiffs compensatory damages sustained as a result of the wrongs alleged in the Complaint in an amount to be determined at trial;

(ii) Awarding Plaintiffs punitive damages in an amount to be determined at trial;

(iii) Awarding Plaintiffs prejudgment interest in an amount to be determined at trial;

(iv) Awarding Plaintiffs their costs and expenses incurred in this litigation, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

(v) Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:    April 8, 2004

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

Gregory A. Markel (GM- 5626)
Jason M. Halper (JH-8310)

100 Maiden Lane
New York, New York 10038
Telephone: (212) 504-6000

Attorneys for Plaintiffs

-69-